WILSHIRE–LA CIENEGA GARDENS CO., a corporation, Plaintiff,

v.

Robert A. RIDDELL, Director of Internal Revenue, Defendant.

BALDWIN GARDENS CO., a corporation, Plaintiff,

v.

Robert A. RIDDELL, Director of Internal Revenue, Defendant.

Richard S. DILLER and Eudice I. Diller, Plaintiffs,

v.

Robert A. RIDDELL, Director of Internal Revenue, Defendant.

Irving L. KALSMAN and Lee Kalsman, Plaintiffs,

v.

Robert A. RIDDELL, Director of Internal Revenue, Defendant.

Arthur B. WEBER and Mabel A. Weber, Plaintiffs,

v.

Robert A. RIDDELL, Director of Internal Revenue, Defendant.

Herman KRANZ and Sylvia Kranz, Plaintiffs,

v.

Robert A. RIDDELL, Director of Internal Revenue, Defendant.

Nos. 16720–16725.

United States District Court
S. D. California,
Central Division.

Aug. 13, 1956.

Laughlin E. Waters, U. S. Atty., Edward R. McHale, Asst. U. S. Atty., Chief, Tax Division, Bruce I. Hochman, Asst. U. S. Atty., Los Angeles, Cal., for plaintiffs.

Krystal & Paradise, Los Angeles, Cal., for defendant.

WESTOVER, District Judge.

The six above entitled actions were consolidated for trial. They involve two corporations—Wilshire-La Cienega Gardens Co. (hereinafter called Wilshire-La Cienega) and Baldwin Gardens Co. (hereinafter called Baldwin Gardens)—and the officers and directors of the two corporations. Certain issues raised by the pleadings in the first of the listed cases have been conceded by plaintiffs herein. Three issues remain for decision. The first concerns the case first listed; the second concerns the second listed case, and the third issue concerns the last four cases listed.

Wilshire-La Cienega and Baldwin Gardens were organized for the purpose of constructing multiple housing projects to be financed by obtaining from the Federal Housing Administration contract or contracts of construction under § 608, Title VI of the National Housing Act, 12 U.S.C.A. § 17443.

On December 23, 1948, Wilshire-La Cienega received a loan commitment from the Federal Housing Administration, guaranteeing a loan in the sum of $1,937,600 for the purpose of constructing on the Wilshire-La Cienega land a multiple housing project. Pursuant to said Federal Housing Administration commitment Wilshire-La Cienega borrowed from John Hancock Mutual Life Insurance Co., under a loan commitment

from said company dated October 26, 1948, the sum of $1,937,600 which was repayable over a term of thirty-three years and one month. In January, 1949, Wilshire-La Cienega commenced construction of this multiple housing project, consisting of approximately 260 rental units.

On February 16, 1949, Baldwin Gardens received a loan commitment from the Federal Housing Administration guaranteeing a loan in the amount of $2,866,400 for the purpose of constructing a multiple housing project. Pursuant to said Federal Housing Administration commitment, Baldwin Gardens borrowed from John Hancock Mutual Life Insurance Co. $2,866,400, payable over a term of thirty-three years and six months.

Sometime before completion of the projects it became apparent to the directors and officers of the corporations that all the money received from the John Hancock Mutual Life Insurance Co. for the construction projects would not be used in the contemplated work. On July 31, 1951, during the corporate fiscal year which ended August 31, 1951, Wilshire-La Cienega paid to Richard S. Diller, Arthur B. Weber and Herman Kranz (its board of directors) $9,000 each for "services rendered" by them to Wilshire-La Cienega.

Testimony introduced at the trial indicated that Messrs. Diller, Weber and Kranz for many years had been engaged in the building and financing business in Los Angeles County and were speculators in land development. Each of them had outside interests; they did not give their entire time and consideration to the corporation business, and they were not regular employees of the corporation. The $9,000 paid to each was allegedly for "services rendered" from the inception of the project to the date of payment. None of the records of the corporation show that any of these men prior to the payment was on the regular pay roll. However, when the payments were made the corporation treated said payments as remuneration "for services rendered"

deducting therefrom Social Security, Unemployment and Withholding taxes.

The income tax return filed by the corporation disclosed these payments, and upon audit of the return the Internal Revenue Agent, acting for the Commissioner of Internal Revenue, disallowed the amounts of $9,000 each, reducing each item to $2,000. The deficiency assessment was paid by the corporation, which then filed a claim for refund of overpayment of tax. Thereafter, upon expiration of the statutory time, this action was duly filed, the Internal Revenue Service having failed to act upon the claim.

 The first question to be determined in the Wilshire-La Cienega case is whether the allowance of $2,000 to each of these individuals as compensation for "services rendered" to the corporation is adequate.

It appears in controversies like this, in which a court is called upon to pass upon a claim for refund, the burden is upon the taxpayer to show he is entitled to the amount claimed. Acer Realty Co. v. Commissioner, 8 Cir., 132 F.2d 512. No evidence is found in the records of the action at bar to substantiate the claim of $9,000 for services rendered by each or any of these individuals. It was an arbitrary figure, paid without respect to the amount of work performed or services rendered. This Court agrees with the Agent that $2,000 each is an adequate allowance.

 The first rental unit of Baldwin Gardens project was completed and available for renting in September, 1949, and the entire project had been completed by the end of October, 1949. In connection with its construction Baldwin Gardens laid out a street, running for the convenience of the tract from its east side to its west side. It paved the street and erected street lighting standards thereon. The cost to Baldwin Gardens for the laying, paving and improvements to complete the street was $45,823.99. The cost to Baldwin Gardens for erection of the light standards was $6,500. Bald-

win Gardens paid to the City of Los Angeles for street lighting energy and maintenance of the standards the sums of $230 and $277. Thereafter Baldwin Gardens dedicated the street to the City of Los Angeles. Baldwin Gardens capitalized the said sums of $230, $277, $6,-500 and $45,823.99 as a portion of the cost of said multiple housing project and claimed a deduction for depreciation thereon in its federal income tax return. Upon audit the Revenue Agent disallowed the claim for depreciation.

It appears to this Court that in a multiple housing project the costs of laying out streets, paving, gas, electricity, et cetera, should be considered as a part of the erection cost of the project but, under the circumstances outlined, cannot be handled as a depreciable item. If and when the housing project is sold, the corporation may at that time properly take advantage of the capitalization of the street improvement. The claim of Baldwin Gardens relative to depreciation is disallowed in accordance with the Agent's findings.

Evidence in the Wilshire-La Cienega case establishes that the loan commitment obtained from the John Hancock Mutual Life Insurance Co. was dated October 26, 1948; that the first rental unit was completed and available for renting in July, 1949, and the entire project was completed and available for full renting by the end of August, 1949. Consequently, Wilshire-La Cienega started to receive income from rents as early as July, 1949, and as each unit was completed and rented the income increased. At the time the project was constructed there was an acute shortage of housing in Los Angeles, and as a result these units were rented as fast as they were completed. In fact, in many instances tenants would move into the new units and start paying rent before actual completion.

On January 27, 1950, a special meeting of the board of directors of Wilshire-La Cienega was held. The Minutes of the special meeting read, in part, as follows:

"The treasurer reported that this corporation had on hand approximately $165,000.00, representing in the main a reserve for depreciation and the unused portion of a construction loan. He stated that in his opinion distribution of. $50,000.-00 respectively to each of the three common shareholders could be made with safety * * *

"Upon motion duly made, seconded and unanimously carried, the following resolution was adopted:

"Whereas, this corporation has completed its rental housing project under Section 608 of the National Housing Act; and

"Whereas, the same is 100% occupied; and

"Whereas, all reserves required by the Articles of Incorporation of this corporation have been provided for and the insured loan is in good standing and not in default; and

"Whereas, this corporation has cash on hand in the approximate amount of $165,000.00 representing in the main reserve for depreciation and the unused portion of a construction loan; and

"Whereas, a dividend to common shareholders in the aggregate amount of $150,000.00 will not jeopardize its ability to meet its debts and liabilities when and as the same accrue;

"Now, therefore, be it resolved, that a dividend of $1500.00 per share to the common shareholders of record of this corporation be and the same hereby is declared payable forthwith, the same to be payable out of the reserve for depreciation and the unused portion of the construction loan."

Pursuant to the foregoing Resolution, passed and adopted by board members Richard S. Diller, Arthur B. Weber and Herman Kranz, each received his proportionate share of the amount ordered distributed. The money so received from the corporation was reported by each individual on his federal income tax return as a long-term capital gain. The Internal Revenue Agent, upon audit of the returns, disallowed the long-term

gain theory and set up the accounts upon the theory that it was ordinary income. He made a deficiency assessment on each return, which was paid. Claims were filed for refund of the alleged overpayment of tax and subsequently this action was filed, the individual taxpayers contending the amounts received as "dividends" under the corporation Resolution set forth above are long-term gains.

Section 22(a) of the 1939 Internal Revenue Code, 26 U.S.C.A. § 22(a), defines gross income as follows:

"'Gross income' includes gains, profits and income derived from salaries, wages, or compensation for personal service * * *, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, * * *; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever * * *."

Section 117(a) of the 1939 Internal Revenue Code, 26 U.S.C.A. § 117(a), defines capital gains and losses as follows:

"(1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), * * * [enumerating exceptions not here pertinent].

* * * * *

"(4) Long-term capital gain. The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income."

In the case at bar the money distributed to the shareholders came from the balance of the construction loan and from rents collected by the corporation. The money remaining unused from the loan was, so far as the corporation was concerned, money borrowed. However, when that money was distributed to the stockholders it fell into the same category, so far as the shareholders' tax returns were concerned, as the money derived from rents collected and distributed to them. Certainly when the funds were distributed by the corporation to the stockholders it came within the definition of Section 22(a) above quoted. This money cannot be held to be a long-term gain, as it was not the result of a "sale or exchange of a capital asset" as defined by Section 117(a) above.

Consequently, this Court must hold that the amount distributed to the shareholders as "dividends" was ordinary income within the meaning of Section 22 (a) and must uphold the finding of the Internal Revenue Agent.

The situation of the Baldwin Gardens case is similar to that of Wilshire-La Cienega. In the Baldwin Gardens case the following Resolution was adopted by its board of directors:

"Upon motion duly made, seconded and unanimously carried, the following resolution was adopted:

"Whereas, this corporation has completed its rental housing project under Section 608 of the National Housing Act; and

"Whereas, the same is 100% occupied; and

"Whereas, all reserves required by the Articles of Incorporation of this corporation have been provided for and the insured loan is in good standing and not in default; and

"Whereas, this corporation has cash on hand in the approximate amount of $280,000.00 representing in the main reserve for depreciation and the unused portion of a construction loan; and

"Whereas, a dividend to common shareholders in the aggregate amount of $255,000.00 will not jeopardize its ability to meet its debts and liabilities when and as the same accrue;

"Now, therefore, be it resolved, that a dividend of $2550.00 per share to the common shareholders of record of this corporation be and the same hereby is declared payable

forthwith, the same to be payable out of the reserve for depreciation and the unused portion of the construction loan."

Upon receipt of this "dividend" declared by directors Richard S. Diller, Arthur B. Weber and Irving L. Kalsman each reported it, for income tax purposes, as a long-term gain. Upon audit the Internal Revenue Agent deemed the amount ordinary income and not "sale or exchange of capital asset" to come within the definition of long-term gain. The Agent assessed a deficiency accordingly, which the taxpayers paid. They then filed claims for refund of the amounts paid and subsequently filed these actions.

As in the Wilshire-La Cienega case, it is the holding of this Court that the amounts declared as "dividends" in the Baldwin Gardens corporation should have been reported by the individual recipients as ordinary income rather than as long-term gains, and the findings of the Internal Revenue Agent are affirmed.

Judgment will be entered in all these cases in favor of defendant. Counsel for defendant is instructed to prepare findings of fact, conclusions of law and judgment for presentation to the Court not later than the 10th day of September, 1956.