ALGERNON BLAIR, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 62096. Filed March 31, 1958.

*H. Cecil Kilpatrick, Esq.*, for the petitioner.
*Lester R. Uretz, Esq.*, for the respondent.

1210

BLACK, *Judge:* The issues will be discussed in the same order as the findings of fact relating thereto.

### Issue 1. Intercompany Eliminations.

Petitioner, a general contractor, filed a consolidated return for the year 1953 with two wholly owned subsidiaries, Forest Hills and Loxley Annex. The first issue requires a determination of the amount of unrealized profit arising from intercompany transactions which should be eliminated in the computation of consolidated net income on that return.

During the year in question, petitioner, which reports on the completed contract basis, completed nine contracts, including one for Forest Hills and one for Loxley Annex, both of which were wholly owned subsidiaries. Under the contracts with the subsidiaries housing projects were constructed. The subsidiaries held the projects for rental purposes.

Regulations 129, to which the petitioner consented by filing a consolidated return (see sec. 141 (a), I. R. C., 1939 [3]), provide that "[t]he consolidated net income shall be the combined net income of the several affiliated corporations" (Regs. 129, sec. 24.31 (a) (1)) and that "[t]he net income of each corporation shall be computed in accordance with the provisions covering the determination of net income of separate corporations, except—(i) There shall be eliminated unrealized profits and losses in transactions between members of the affiliated group" (Regs. 129, sec. 24.31 (b) (1)).

Since the subsidiaries held the housing projects at the end of 1953, any profits realized on those contracts by the petitioner would be unrealized profits for consolidation purposes. Both parties agree to this. The dispute arises in the computation of the unrealized profits.

Petitioner computed its income on the completed contract basis. Under this method it accumulated the total revenues derived from the contract and the total costs which it considered were incurred in the performance of the contract. It characterized these costs as direct

---

[3] Unless otherwise noted, all section references are to the Internal Revenue Code of 1939, as amended.

costs. The difference between the two it reported as gross profit or loss in the year in which the contract was completed. The costs which it did not consider attributable to any specific contract were deducted currently, in the year in which incurred. These latter costs which it characterized as general expenses included such items as officers' salaries, salaries of home office employees, other home office expenses, State income taxes, and bonuses (petitioner distributed among all employees 40 per cent of its net income before taxes as a bonus). This method of accounting is sanctioned by the regulations [4] and is in accord with accepted accounting principles. [5]

The petitioner, in the computation of its net income for consolidation purposes, eliminated the gross profit on the two contracts completed for its subsidiaries. The respondent, in effect, determined that only the net profit should be eliminated. Respondent computed the net profit by allocating the general expenses for 1953 to the nine contracts completed in 1953 on a gross profit basis (in the same proportion that the gross profit on a contract bore to the total gross profit) and then deducted from the revenue on each contract the total direct costs and the proportionate share of the general expenses. It may be pointed out that work was commenced in 1952 on some of the contracts completed in 1953 and that at the end of 1953 there were four uncompleted contracts on which costs had been incurred.

The regulations do not indicate whether the unrealized profit to be eliminated is gross profit or net profit. And although this is essentially an accounting problem there is disagreement among accountants as to the preferred practice. [6]

---

[4] See Regs. 118, sec. 39.42–4.

[5] See American Institute of Accountants, Accounting Research Bulletin No. 45 (1955).

[6] Compare Finney and Miller, Principles of Accounting—Advanced (4th ed. 1952), p. 391 :
"What is the intercompany profit? Should the amount of the deduction for intercompany profit be based on the gross or the net profit of the selling company? The gross profit is the generally accepted basis. It has been suggested by some accountants that the amount of the deduction should be determined by using the selling affiliate's ratio of net income to sales rather than its rate of gross profit. This procedure would, of course, result in a smaller deduction. The use of the ratio of net income to sales might be justified if all expenses varied in exact proportion to the sales ; this, however, is not the normal condition. Many expenses are fixed ; others vary, but not in direct proportion to the sales ; and it is therefore incorrect to assume that the elimination of the intercompany sales would result in a corresponding reduction in the expenses. Neither is it practicable to undertake to allocate expenses between intercompany and outside sales. Under the circumstances, therefore, the expedient and conservative procedure is to compute the deduction for intercompany profit on the basis of the rate of gross profit."
with Wixon, Accountants Handbook (4th ed. 1956), at page 23–30 :
"Under an ideal treatment, in fact, all charges actually incurred from the standpoint of the consolidated entity, and reasonably applicable to goods on hand in the group as opposed to goods sold to the outside, should be deferred. In other words, the amount to be eliminated as unrealized is the element of net income, not gross markup over assigned production cost."
Also see Moonitz, The Entity Theory of Consolidated Statements (1951), p. 69.

The above-quoted accounting materials deal with the sale of merchandise rather than the sale of multiple-housing units. However, the problem, we think, is essentially the same.

In *Union Pacific Railroad Co.*, 32 B. T. A. 383, 384–388 (1935), affirmed on other points (C. A. 2, 1936) 86 F. 2d 637, a somewhat similar issue was involved. The affiliated corporations transported for one another material used in additions and betterments. The cost of these materials was capitalized by the receiving affiliate. The transporting affiliate charged the receiving affiliate the published tariff rate. In computing the consolidated net income these charges were eliminated from the revenue account of the transporting affiliate and from the expense account of the receiving affiliate. Thus, on the transporting affiliate's books was left the cost incurred by it in transporting the goods. Both the taxpayer and the Commissioner agreed that this cost should not be deducted currently but must be capitalized as part of the additions and betterments. The dispute related to the computation of that cost. The actual cost could not be computed. The Commissioner contended that the cost should be a proportionate share of all the costs including general expenses. The taxpayer contended that the latter expenses would have been incurred regardless of whether there was any intercompany transportation and that the cost should be only a proportionate share of the direct transportation costs. We rejected the contentions of both parties and held that the "cost" of transporting intercompany goods was a proportionate share of all costs reasonably related to transporting goods and, in the absence of such cost in the record, we used an Interstate Commerce Commission estimated figure.

The pertinent parts of the regulations in effect for the years involved in *Union Pacific Railroad Co.*, *supra*, are for all practical purposes the same as involved here.[7] And although the problem there is stated in terms of "cost" rather than "profit," it is essentially the same as involved here.

Also, by analogy, the problem here is the same as if the petitioner had built the projects for its own use. Instead of the question of intercompany profits there would be a question of cost to itself which, of course, requires the same determination. Cost to itself would depend on which costs are to be capitalized and which are to be deducted currently as ordinary and necessary business expenses. In *Acer Realty Co.*, 45 B. T. A. 333, 336–338 (1941), affd. (C. A. 8, 1942) 132 F. 2d 512, we held that costs incidental to the construction or improvement of buildings, or in connection with the acquisition of capital assets, is a capital expenditure and not ordinary and necessary expense of carrying on a business.

---

[7] See Regs. 65, art. 636; Regs. 69, art. 635; and Regs. 74, art. 734, providing for the elimination of intercompany transactions (whether or not resulting in any profit or loss to the separate corporation) and Regs. 75, art. 31 (a), providing for the nonrecognition of gain or loss in intercompany transactions.

The rule emerging from these cases, stated in terms of cost, is that the cost of an asset includes all costs reasonably related or incidental to its construction or acquisition; in terms of profit for consolidation purposes it would be the gross profit less any other costs reasonably related or incidental to the construction or acquisition of the asset. This comports with an accepted accounting view [8] and appears to be one based on practical necessities and reason. We follow it here.

Under the above rule we must determine which, if any, of the expenses characterized by the petitioner as general expenses are reasonably related or incidental to the two contracts completed for its subsidiaries. The petitioner has offered evidence showing an allocation of some of the general expenses. The respondent has offered no evidence supporting his determination and it is clear that his determination that all of the general expenses are allocable to the nine completed contracts on a gross profit basis cannot stand. Many of the general expenses are in no way related to any of the specific contracts. And even assuming that all of the general expenses were reasonably related to the specific contracts, the allocation is erroneous because there is no rational relation between the gross profit on a contract and the general expense incurred. For example, the contract with a gross loss would receive an allocation of a minus amount of general expenses. "In these circumstances the general rule of the burden of proof falls short of a solution, *Helvering* v. *Taylor*, 293 U. S. 507." *Union Pacific Railroad Co., supra* at p. 387.

It is clear, it seems to us, that a portion of the salaries and bonuses of the project managers and the bonuses paid to those who worked on the contracts for the subsidiaries are reasonably related to the contracts performed for the subsidiaries. Petitioner has prepared an allocation of these costs, which seems reasonable, and we have adopted it as part of our findings of fact. The amounts so allocated should be added to the cost of the contracts performed for Forest Hills and Loxley Annex. No attempt has been made to allocate any of the other general expenses. We are convinced that some portion of the other general expenses is reasonably related to the performance of the contracts for the subsidiaries. In the absence of any specific evidence or proof, we have exercised our best judgment and found that an additional $30,000 of general expense incurred was reasonably related to the performance of the Forest Hills contract and an additional $8,000 of general expense incurred was reasonably related to the Loxley Annex contract. Cf. *Cohan* v. *Commissioner*, (C. A. 2, 1930) 39 F. 2d 540, 543–544; *Union Pacific Railroad Co., supra*.

These adjustments can be made under Rule 50.

---

[8] See the views expressed in Accountants Handbook and The Entity Theory of Consolidated Statements, footnote 6, *supra.*

*Issue 2. Depreciation.*

The respondent partially disallowed the depreciation claimed by Forest Hills and Loxley Annex. The dispute here relates only to the basis for depreciation.

In the construction of the multiple-housing projects, Forest Hills and Loxley Annex segregated their costs into groups, viz, land, general improvements, building, building equipment, and furnishings. In addition to the direct costs which could be clearly segregated into the above-mentioned groups there were a number of indirect costs which related to the projects as a whole such as engineering and architect fees, interest on construction loans, legal fees, various types of insurance, depreciation on equipment, etc. The petitioner allocated these indirect costs to the categories of direct cost, except land, in the same proportion that each category of direct cost bore to the total direct cost, except land. The petitioner then treated the entire cost in each category, except land, as depreciable and computed its depreciation thereon.

The respondent made certain adjustments. First, he divided the direct costs in the category general improvements into depreciable and nondepreciable. (Petitioner had treated all direct costs in that category as depreciable.) In the nondepreciable category he included the direct cost of (1) items which he designated as additional land cost and (2) items which were maintained by the local governments and dedicated to the public use. The former included the cost of site work, grading, landscaping, and planting grass and shrubs. The latter included the cost of street paving, curbs, sidewalks, and utilities such as water and gas mains, storm and sanitary sewers, and drainage facilities. The respondent then divided the indirect costs into depreciable and nondepreciable, the division being in the same ratio that the depreciable and nondepreciable direct costs bore to the total direct costs. The indirect costs, thus divided, were allocated to all of the categories of direct costs in the same proportion that each category bore to the total direct costs.

The respondent, on brief, has made certain concessions of error relating to the adjustments underlying his disallowance of a portion of the claimed depreciation. These concessions should be given effect under Rule 50. Although it is not clear from certain remarks at the hearing and from the brief which of the adjustments are still being contested, we will hereafter discuss the three basic adjustments of respondent which result in the disallowance, all of which (disallowance) was put in issue by the pleadings.

(*a*) *Additional land cost.*—The petitioner included the direct cost of such items as clearing, grading, and landscaping, including planting of grass and shrubs, in the category of general improvements and

claimed depreciation thereon. The respondent has determined that the cost of these items, less a portion which he attributed to depreciable assets, such as buildings, should be added to the cost of the land and treated as nondepreciable.

The petitioner offered no evidence on this point. It would seem that a portion of the clearing cost would be attributable to the buildings and respondent has allocated a portion thereto. The other items, from their description, appear to be "inextricably associated" with the land rather than the buildings. Furthermore, there are no patent inconsistencies in the adjustments made by respondent relating to these items as there are in some of the other adjustments.

In this state of the record we must uphold the respondent on these adjustments subject, of course, to any concessions made by him in his brief on this point.

(b) *Facilities maintained by local governments and dedicated to public use.*—Forest Hills and Loxley Annex, concurrently with the construction of the housing units, constructed sidewalks, curbs, paved streets, sewers, and water mains. Upon completion of the projects the local government units took over all of the functions of maintenance of these facilities and they became part of the street systems for public use and convenience.

The costs of these facilities were capitalized and depreciation was claimed on the capitalized costs. Respondent disallowed the depreciation claimed thereon and contends that Forest Hills and Loxley Annex had no depreciable interest in these facilities. Petitioner, on the other hand, contends the facilities were constructed for the benefit of the housing units which they held for rental purposes, had no value other than in connection with the housing units, and that they are entitled to recover their cost through depreciation allowances.

It is clear that the facilities in question depreciate, i. e., they are subject to wear, tear, and exhaustion. It is also clear that if these facilities were constructed by the two subsidiary corporations on property owned by them and which they continued to own and possess, they would be entitled to recover their cost by depreciation allowances. *Clinton Cotton Mills* v. *Commissioner*, (C. A. 4, 1935) 78 F. 2d 292, 296, reversing 28 B. T. A. 1312 (1933). But the question here is whether the depreciation allowance is still available where the facilities are maintained by others and dedicated to the public use.

In *F. M. Hubbell Son & Co.* v. *Burnet*, (C. A. 8, 1931) 51 F. 2d 644, affirming 19 B. T. A. 612 (1930), the taxpayer, an owner of rental property, was required by special assessments to make expenditures on account of paving, curbing, and sidewalk improvements in connection with property owned by it. It capitalized these costs and claimed an allowance for depreciation thereon. The court held that although

the improvements increased the rental value of, and benefited, the taxpayer's property that they were not used exclusively in the taxpayer's trade or business but were used primarily in the business and for the service of the public. Also, the property being public property, the taxpayer would not have that special pecuniary interest in the property concerning which a depreciation deduction is allowable.

In the instant case, the facilities were built by the petitioner and turned over to the local governments rather than built by local governments and paid for through special assessments as in the *Hubbell* case, *supra*. But any real distinction in what occurred or in principle is at most tenuous. The fact that Forest Hills and Loxley Annex owned all of the adjoining properties is without controlling significance in view of the fact that the facilities are used primarily in the public business. Obviously, if the local governments had built the facilities and then assessed the adjoining landowner, the landowner could not recover the assessment by way of depreciation allowances. We think the instant facts require the same result. See *Wilshire-LaCienega Gardens Co.* v. *Riddell*, (S. D. Calif., 1956) 148 F. Supp. 938, 940–941, where the same result was reached on facts similar to those here involved.

The petitioner's reliance on *Clinton Cotton Mills* v. *Commissioner*, *supra*, is misplaced. We stated (28 B. T. A. 1312, 1315–1316) that:

If these improvements were on the streets of Clinton dedicated to public use, the cost of paving is not amortizable; *F. M. Hubbell Son & Co.*, 19 B. T. A. 612; affd., 51 Fed. (2d) 644; certiorari denied, 284 U. S. 664; if on its own property and used in its business, it is entitled to recover its investment therein by ratable annual deductions from income. * * *

However, we held for the Commissioner because of a failure of proof. The Court of Appeals for the Fourth Circuit reversed us on that point on the ground that expenditures were made on private property. The court distinguished the *Hubbell* case, *supra*, and in effect agreed with us in principle. *Union Electric Co. of Missouri*, 10 T. C. 802 (1948), the other case relied on by petitioner, is clearly distinguishable on its facts.

Accordingly, we uphold the respondent on these adjustments subject, of course, to any concessions made by him in his brief on this point.

(*c*) *Allocation of indirect costs.*—Petitioner allocated the indirect costs to all of the direct costs except the land cost. Respondent has adjusted this by allocating a portion of the indirect costs to the land. As pointed out by petitioner, the respondent's allocation contains certain mathematical inconsistencies. Aside from that, we think that respondent was in error in allocating a portion of the indirect costs to basic land cost.

A mere glance at the items listed as indirect costs shows that they relate only to the improvements. In these circumstances it is difficult to see why any of them should be allocated to the basic land cost. We, therefore, think the indirect costs should be allocated proportionately to all of the direct costs except the basic land cost. Of course, under this holding some of the indirect costs will be allocated to the other items which we have held to be nondepreciable.

*Decision will be entered under Rule 50.*