*Decision will be entered under Rule 50.*

HERBERT SHAINBERG AND MARIETTE SHAINBERG, PETITIONERS, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.
NATHAN SHAINBERG AND DOROTHY SHAINBERG, PETITIONERS, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.
BEN GOLDSTEIN AND MINNIE GOLDSTEIN, PETITIONERS, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 71618, 71619, 71620. Filed November 10, 1959.

242

W. *Stuart McCloy*, *Esq.*, for the petitioners.
*Jack D. Yarbrough*, *Esq.*, for the respondent.

MULRONEY, *Judge:* Respondent determined deficiencies in the petitioners' income tax as follows:

| Petitioner | Docket No. | Deficiency | |
|---|---|---|---|
| | | 1954 | 1955 |
| Herbert Shainberg and Mariette Shainberg | 71618 | $8,971.78 | $8,127.60 |
| Nathan Shainberg and Dorothy Shainberg | 71619 | 8,365.28 | 7,582.23 |
| Ben Goldstein and Minnie Goldstein | 71620 | 9,006.03 | 8,164.92 |

The issues in these consolidated cases are:

(1) Whether certain expenditures by the partnership, Lamar-Airways Shopping Center, for the Tennessee sales tax, accounting services, cleaning services, insurance, and a survey fee were capital expenditures or deductions in the years incurred;

(2) Whether the depreciation deduction claimed by the partnership for its shopping center buildings was unreasonable in amount;

(3) Whether the partnership is entitled to a deduction for depreciation of shrubbery planted in its shopping center in 1954; and

(4) Whether the useful life, for purposes of the depreciation deduction of certain benches and waste receptacles, is 10 years or some lesser figure.

### FINDINGS OF FACT.

Herbert and Mariette Shainberg, Nathan and Dorothy Shainberg, and Ben and Minnie Goldstein, the petitioners, are residents of Memphis, Tennessee, and they filed respective joint Federal income tax returns for the years 1954 and 1955 with the district director of internal revenue at Nashville, Tennessee. Herbert, Nathan, and Ben will hereinafter be called the petitioners.

In 1952 the petitioners formed a partnership for the purpose of acquiring a tract of land, constructing thereon, and renting commercial units in a shopping center. Each of the petitioners owned a one-third interest in the partnership, known as the Lamar-Airways Shopping Center, sometimes hereinafter called Lamar-Airways. The partnership acquired a tract of land, forming an approximate triangle, in Memphis, Tennessee. In 1953 construction was started on the shopping center which was to consist of the Main Building, Service Station, Goodyear Building, the Professional Building, and a parking area. The Main Building was completed in early September 1954 and the shopping center was opened for business on September 9, 1954. The Service Station, Goodyear Building, and the Professional Building were completed on March 1, 1955, November 1, 1955, and October 1, 1955, respectively. All of the buildings in the shopping center are 1-story structures, with the exception of the Professional Building, which has two stories. Lamar-Airways adopted a calendar year accounting period and its records were kept on a cash basis. Its partnership returns of income for the years 1954 and 1955 were filed with the district director of internal revenue at Nashville, Tennessee.

The shopping center is located on approximately 10 acres of land, of which a little in excess of 7 acres is owned by Lamar-Airways and the rest leased. The cost of the land to Lamar-Airways was approximately $400,000. The location of the tract is very favorable for purposes of a shopping center. It is situated a few miles outside the city limits of Memphis, on one of the most heavily traveled highways, with street frontage on all three sides of its triangular shape. There are 17 retail outlets, a restaurant, and office space in the 2-story Professional Building. The principal tenant of the shopping center is the Katz Drug Company, whose drugstore occupies 30,000 square feet of floor space. There is a good distribution of tenants which include, in addition to the drugstore, a jewelry store, two grocery stores, two shoe stores, a liquor store, a barbershop, a cleaning service, three clothing stores, a hardware store, a dry goods store, an automobile accessories store, a variety store, and a Gulf service station. The leases of 13 of the stores, including the drugstore, are for 10 years, and three of the leases provide for option to renew. Three of the leases are for 15 years with an option to renew in one of them, and one lease is for 5 years. All the leases provided that the lessor was obligated to maintain and repair the roof, exterior walls, foundations, gutters, downspouts, and structural defects, while the lessee was obligated to maintain and repair everything within the walls, including wiring, plumbing, fixtures, glass, air conditioning, heating, and other items not included within the lessor's obligations. Rental

paid by the Katz Drug Company was $2,500 per month, with a provision for an additional payment measured by a percentage of gross sales in excess of $1,000,000. The other tenants paid monthly rentals ranging from $2,000 down to $300, and most of the leases called for an additional payment based on a percentage of gross sales over a certain figure.

Modern construction methods and design were used in constructing the shopping center. The buildings have a structural steel frame with a 13-inch exterior wall, consisting of brick veneer backed up with 9 inches of other masonry. This design and construction made the buildings more flexible in meeting the demands of new tenants by removing exterior walls and adding show windows, additional doors, and other structural changes. Flexibility was also obtained in these buildings by using a suspended ceiling and placing mechanical installations in the space between the suspended ceiling and the roof of the building. The stores in the shopping center had asphalt tile floors. The roof on the buildings was a tar and gravel type.

In 1954 Lamar-Airways paid $1,116.50 for landscaping the grounds of the shopping center. Evergreens and other shrubbery of a perennial kind were planted. Also, in 1954 Lamar-Airways paid $411.73 for benches and $209.92 for waste receptacles. The benches were of a heavy wooden construction about 7 feet in length. The waste receptacles are large metal cans with flap openings. Both the receptacles and the benches are kept out in the open.

The construction of the shopping center was performed by the Tri-State Construction Co., hereinafter called the contractor, under a contract executed on June 8, 1953. Under the contract the contractor was to provide all necessary labor and materials and to engage all subcontractors. Compensation to the contractor was on a job cost plus 6 per cent fee basis. The contract defined job cost as follows:

All items of job costs are reimbursible to the contractor. Job costs are defined as follows: All costs of labor, materials, supplies, subcontractor's contracts, all permits, taxes, insurance, (insurances to be carried by this contractor are workmen's compensation, public liability and property damage.) The owner is to carry all insurance covering fire damage. Additional job costs include all utilities (fuel, power, water) tool and equipment rental, cost of perishable tools, freight and express, truck rental and hauling expenses, superintendents, foremen and clerk of the works wages and all other miscellaneous items not specifically recited herein.

During the construction of the shopping center the contractor paid the construction costs and then billed Lamar-Airways on a cost-plus basis at periodic intervals. These periodic billings were supported by the paid invoices of the contractor. The contractor paid the

Tennessee sales tax on all materials for the construction of the shopping center and listed these taxes, along with the other job costs, on the invoices submitted to Lamar-Airways for payment. These invoices reflected the Tennessee sales tax in the amounts of $4,136.63 and $879.31 for the years 1954 and 1955, respectively.

In 1954 and 1955 Lamar-Airways paid to the contractor the amounts of $2,082.79 and $117.35, respectively, for cleaning services. These amounts were on invoices submitted by the contractor to Lamar-Airways. The cleaning service performed by the contractor in 1954 at a cost of $2,082.79 was for the purpose of getting the shopping center ready for its opening. A portion of this 1954 total amount, or $1,493.16, was incurred after August 1, 1954.

Lamar-Airways made payments to the accounting firm of Harry M. Jay and Associates in the total amount of $3,823.57 during the year 1954. The payments were made on the dates and in the amounts as follows:

Feb. 16, 1954 _____ $1, 000. 00
June 15, 1954 _____ 1, 459. 13
Sept. 14, 1954 _____ 1, 364. 44
                                                     _____
                                                      3, 823. 57

The accounting firm in 1954 reviewed the partnership return filed by Lamar-Airways for the year 1953 and it audited the construction contract and the work done under it by the contractor. The accounting firm checked all the invoices that supported the periodic estimates submitted by the contractor for payment, checked the various items of labor that were charged to the contract, and analyzed the various component parts of the work done under the contract, and prepared property schedules in order to provide a basis for the assets that were to be depreciated later. The accounting firm did not set up the books of Lamar-Airways.

Lamar-Airways paid premiums in 1954 in the amount of $1,750 for fire and extended coverage insurance. This insurance was on the buildings in the shopping center during the process of construction. The premiums were paid to Herman Gruber & Company, a corporation dealing in real estate and insurance. Lamar-Airways paid $250 in 1955 as a fee for the survey of the shopping center's facilities. This was done in connection with attempts by the partnership to obtain permanent financing which did not materialize at the time. Later, in 1956, the partnership paid an additional fee to get a further survey for the permanent financing, which was finally obtained.

Lamar-Airways, in its partnership return of income filed for 1954, claimed a deduction as an ordinary and necessary expense for the

entire amount of $3,823.57 paid in 1954 to the accounting firm, Harry M. Jay and Associates. Respondent disallowed this entire amount with the explanation that it represented a capital expenditure. The partnership claimed deductions for the Tennessee sales tax in the amounts of $4,136.63 and $879.31 in the returns of income filed by it for the years 1954 and 1955, respectively. Respondent disallowed these amounts with the explanation that "these taxes represent a part of the cost of construction of Lamar-Airways Shopping Center and are capital expenditures."

Lamar-Airways claimed deductions in its partnership returns of income for 1954 and 1955 for cleaning services in the amounts of $2,372.79 and $1,777.92, respectively. Respondent disallowed the claimed deductions to the extent of $2,082.79 for the year 1954 and $117.35 for the year 1955 with the explanation that these items were capital expenditures. Lamar-Airways claimed a deduction of $9,639.59 for insurance expense in its return for 1954 and respondent disallowed this entire amount as a capital expenditure. It was stipulated that $7,889.59 out of the total amount of $9,639.59 was a capital expenditure. Lamar-Airways claimed a deduction for a survey fee in the amount of $250 for the year 1955 and it was disallowed by the respondent as a capital expenditure.

In its partnership returns of income filed for the years 1954 and 1955, Lamar-Airways, for the purposes of depreciation, placed the buildings (composed of the steel structure, brick walls, foundations, glass front, and steel canopy) and the building equipment, such as wiring, plumbing, roof, and ceilings, into separate components and computed the depreciation allowance separately on each component on a 200 per cent declining balance method, as follows:

SCHEDULE E—DEPRECIATION

[Year Ending December 31, 1954]

| | Cost 9-9-54 | Est. Life | Method | Annual Depreciation | Allowable 9-9- to 12-31-54 |
|---|---|---|---|---|---|
| Structures | $693,189.99 | 40 years | 200% D B | $34,659.50 | $10,824.16 |
| Wiring | 191,545.42 | 15 years | 200% D B | 25,539.39 | 7,975.95 |
| Plumbing | 61,623.14 | 15 years | 200% D B | 8,216.42 | 2,565.99 |
| Roof—tar & gravel | 38,152.72 | 10 years | 200% D B | 7,630.54 | 2,383.02 |
| Acoustical ceiling | 10,965.47 | 10 years | 200% D B | 2,193.09 | 684.90 |
| Fibre board ceiling | 24,465.93 | 10 years | 200% D B | 4,893.19 | 1,528.14 |
| Asphalt tile floor | 16,338.62 | 10 years | 200% D B | 3,267.72 | 1,020.51 |
| Air conditioning | 89,280.67 | 15 years | 200% D B | 11,904.09 | 3,717.65 |
| Parking lot: | | | | | |
| Asphaltic paving | 68,904.37 | 10 years | 200% D B | 13,780.87 | 4,303.77 |
| Concrete curbing | 44,278.07 | 40 years | 200% D B | 2,213.90 | 691.40 |
| Illuminated signs | 4,678.74 | 5 years | 200% D B | 1,871.50 | 584.47 |
| Fixtures | 25,218.05 | 10 years | 200% D B | 5,043.61 | 1,575.12 |
| Ocean liner ride | 900.00 | 3 years | 200% D B | 600.00 | 187.38 |
| Crusader ride | 459.00 | 3 years | 200% D B | 306.00 | 95.56 |
| | $1,270,000.19 | | | $122,119.82 | $38,138.02 |

SCHEDULE G—DEPRECIATION.
YEAR ENDED DECEMBER 31, 1955

| | Cost Basis, including additions made in 1955 | | |
| --- | --- | --- | --- |
| | BALANCE 12–31–55 | EST. LIFE | ALLOW-ABLE 1–1–55 to 12–31–55 |
| Main Structure—Shopping Center: | | | |
| Buildings | $699,283.81 | 40 years | $34,270.64 |
| Wiring | 199,877.55 | 15 years | 25,031.41 |
| Plumbing | 62,585.69 | 15 years | 7,938.46 |
| Roof—tar & gravel | 38,140.97 | 10 years | 7,152.76 |
| Ceilings | 36,305.73 | 10 years | 6,731.10 |
| Asphalt tile floors | 16,324.82 | 10 years | 3,062.24 |
| Air conditioning | 88,944.96 | 15 years | 11,363.64 |
| | $1,141,463.53 | ----------- | $95,550.25 |
| Parking Area: | | | |
| Asphaltic concrete | $68,644.68 | 10 years | $12,894.15 |
| Curbings | 44,189.39 | 40 years | 2,177.11 |
| | $112,834.07 | ----------- | $15,071.26 |
| Service Station: | | | |
| Building | $23,127.07 | 15 years | $2,569.67 |
| Wiring | 1,755.00 | 15 years | 195.00 |
| Plumbing | 2,449.00 | 15 years | 272.11 |
| Roof—tar & gravel | 688.18 | 10 years | 114.70 |
| Heating | 1,480.00 | 10 years | 246.67 |
| Paving | 1,729.00 | 10 years | 288.17 |
| | $31,228.25 | ----------- | $3,686.32 |
| Goodyear Building: | | | |
| Building | $63,696.73 | 40 years | $530.82 |
| Wiring | 5,209.12 | 15 years | 115.76 |
| Plumbing | 7,171.28 | 15 years | 169.36 |
| Ceilings | 1,401.75 | 10 years | 46.72 |
| Paving | 1,412.06 | 10 years | 47.07 |
| | $78,890.94 | ----------- | $899.73 |
| Professional Building: | | | |
| Building | $116,276.30 | 40 years | $1,453.45 |
| Wiring | 16,909.86 | 15 years | 563.67 |
| Plumbing | 10,594.88 | 15 years | 353.16 |
| Ceilings | 6,930.13 | 10 years | 346.50 |
| Paving | 860.46 | 10 years | 43.02 |
| Roof | 4,838.60 | 10 years | 241.92 |
| Air conditioning | 20,971.68 | 10 years | 1,048.59 |
| Elevator | 7,588.35 | 15 years | 252.96 |
| | $184,970.26 | ----------- | $4,303.27 |
| Miscellaneous: | | | |
| Illuminated signs | $4,678.74 | 5 years | $1,637.71 |
| Fixtures | 27,029.12 | 10 years | 4,909.70 |
| Ocean liner ride | 900.00 | 3 years | 475.08 |
| Crusader ride | 459.00 | 3 years | 242.30 |
| 2 scales | 300.00 | 5 years | 60.00 |
| | $33,366.86 | ----------- | $7,324.79 |
| Total | $1,582,753.91 | ----------- | $126,835.62 |

Respondent, in his notice of deficiency, combined each of the buildings in the shopping center with the equipment in such building into a composite account for each building, assigned a useful life

to each composite account, and recomputed Lamar-Airways' depreciation allowance for 1954 and 1955 as follows:

| | Date acquired | Cost or other basis | Estimated useful life (years) | Declining balance rate (%) | Dec. 31, 1954 | | Dec. 31, 1955 |
|---|---|---|---|---|---|---|---|
| | | | | | Allowable depreciation | Remaining cost | Allowable depreciation |
| Buildings—in process 12/31/53 | 9-9-54 | $92,754.19 | 40 | 3¾ | [2] $1,159.43 | $91,594.76 | $3,434.80 |
| Buildings | 9-9-54 | [1] 1,070,136.74 | 40 | 5 | [2] 17,835.61 | 1,052,301.13 | 52,615.06 |
| Building additions (return) | 7-1-55 | 15,901.57 | 40 | 5 | | | [2] 397.54 |
| Parking area: | | | | | | | |
| Asphaltic paving | 9-9-54 | 68,644.68 | 10 | 20 | [2] 4,576.31 | 64,068.37 | 12,813.67 |
| Curbings | 9-9-54 | 44,189.39 | 40 | 5 | [2] 736.49 | 43,452.90 | 2,172.65 |
| Illuminated signs | 9-9-54 | 4,678.74 | 5 | 40 | [2] 623.83 | 4,054.91 | 1,621.96 |
| Fixtures | 9-9-54 | 25,218.05 | 10 | 20 | [2] 1,681.20 | 23,536.85 | 4,707.37 |
| Fixtures | 1955 | 1,811.07 | 10 | 20 | | | [3] 181.11 |
| Ocean liner ride | 9-9-54 | 900.00 | 3 | 66⅔ | [2] 200.00 | 700.00 | 466.67 |
| Crusader ride | 9-9-54 | 459.00 | 3 | 66⅔ | [2] 102.00 | 357.00 | 238.00 |
| Benches and receptacles | 10-1-54 | 621.65 | 10 | 20 | [4] 31.08 | 590.57 | 118.11 |
| Service station building | 3-1-55 | 29,499.25 | 25 | 8 | | | [5] 1,966.62 |
| Paving | 3-1-55 | 1,729.00 | 10 | 20 | | | [5] 288.17 |
| Professional building | 10-1-55 | 187,692.96 | 40 | 5 | | | [4] 2,346.16 |
| Paving | 10-1-55 | 860.46 | 10 | 20 | | | [4] 43.02 |
| Goodyear building | 11-1-55 | 77,478.88 | 40 | 5 | | | [6] 645.66 |
| Paving | 11-1-55 | 1,412.06 | 10 | 20 | | | [6] 47.07 |
| 2 scales | 1955 | 300.00 | 5 | 40 | | | [7] 60.00 |
| Total | | 1,624,287.69 | | | 26,945.95 | 1,280,656.49 | 84,163.64 |
| Deduct: Depreciation claimed in returns | | | | | 38,138.02 | | 126,835.62 |
| Adjustment—decrease in allowable depreciation | | | | | 11,192.07 | | 42,671.98 |

[1] Respondent included in this composite cost basis most of the items claimed by Lamar-Airways as deductions and disallowed by the respondent as capital expenditures. The total of these various items listed under adjustments (1) and (2) in the notice of deficiency, is $39,067.12. Two items in this list, benches and receptacles, $621.65, and shrubbery, $1,116.50, were not added to the cost basis. All the rest, amounting to a total of $37,328.97, were included by the respondent in the composite cost basis shown above as $1,070,136.74.
[2] 4 months.
[3] 6 months.
[4] 3 months.
[5] 10 months.
[6] 2 months.

Lamar-Airways, in its partnership returns of income for the years 1954 and 1955, reported ordinary net losses of $68,785.24 and $35,593.71, respectively. The petitioners reported their one-third distributive shares of these losses in their joint income tax returns for said years.

As a result of the adjustments and disallowances made by him in the notice of deficiency, the respondent computed an ordinary net loss for Lamar-Airways in 1954 in the amount of $18,526.05 and ordinary net income for 1955 in the amount of $10,661.43. The changes in the petitioners' distributive shares of the partnership loss for 1954 and the partnership gain for 1955 resulted in the deficiencies determined by the respondent in Docket Nos. 71618, 71619, and 71620.

OPINION.

The first issue is whether the Tennessee sales tax is deductible by the partnership, Lamar-Airways, under sections 164(a) and 164(c)(1) of the Internal Revenue Code of 1954,[1] as claimed by the petitioners, or whether it was a part of the cost of the buildings constructed within the meaning of section 263 and should, therefore, be capitalized, as claimed by the respondent. The sales taxes in dispute were paid in 1954 and 1955 by the contractor on materials used in the construction of the shopping center for Lamar-Airways. The contractor, working under a cost-plus contract, included these sales taxes with the other costs and billed Lamar-Airways for them.

The Tennessee "Retailers' Sales Tax Act" is, in essence, a tax at specified rates for the privilege of conducting a retail business. Secs. 67–3001 and 67–3003, Tenn. Code Ann. The tax is levied on the retail dealer, section 67–3003, who is required to pass it on to the purchaser. Sec. 67–3018. It has been held by the Tennessee Supreme Court that this provision for shifting the tax to the consumer does not change the fact that it is a tax imposed on the vendor. *Smoky Mountain Canteen Co.* v. *Kaiser*, 193 Tenn. 598 (1952), 247 S.W. 2d 69. It is well established that a taxpayer may deduct taxes under section 164(a) only if they are imposed upon him by the taxing authority. *Joe W. Stout*, 31 T.C. 1199. Both the Tennessee sales act and the interpretation of the Tennessee Supreme Court make it obvious that the sales tax in this case was not imposed upon Lamar-Airways but, instead, was imposed upon the retail dealer who sold the construction materials to the contractor. Lamar-Airways is not entitled to this deduction for taxes paid under section 164(a).

It is also clear that Lamar-Airways is not entitled to deduct the sales taxes under section 164(c)(1) which allows a consumer to deduct the sales tax, as such, if it is separately stated and if it is paid by the consumer, but *not* if it is paid "in connection with the consumer's trade or business." Petitioners argue that the contractor was merely an agent or mere conduit of Lamar-Airways in purchasing the materials and that, therefore, Lamar-Airways is the "consumer" who paid the sales tax within the meaning of the subsection. We need not decide this agency argument for petitioners would not prevail in any event. Where a sales tax is imposed upon an item to be used in the purchaser's trade or business and where the item is properly chargeable to expense, the sales tax is properly deductible by him as a business expense, but where the item purchased is properly capitalized, then the sales tax on such item is

---

[1] All section references are to the Internal Revenue Code of 1954 unless otherwise noted.

also to be treated as a capital item, and it becomes a part of the cost basis of the capitalized item. For instance, a taxpayer in business who pays a sales tax on nails to be used in business repairs, may deduct such sales tax as a business expense, but where the same taxpayer pays a sales tax on a steam boiler for use in his business which is properly capitalized under the circumstances, then he must add the sales tax to the cost basis of the steam boiler. If the same businessman paid a sales tax on the purchase of an automobile to be used for pleasure the sales tax would be deductible under section 164 (c) (1) if it was separately stated. The amounts here paid by Lamar-Airways were clearly incurred "in connection with [its] trade or business," namely: To acquire a capital asset for use in its business as a shopping center, and section 164(c)(1), by its very terms, is inapplicable. We hold that the amounts of sales taxes, which were billed by the contractor as part of the job costs under the construction contract, must be capitalized as a part of the cost of the buildings of which they became integral parts. Sec. 263.

Lamar-Airways claimed a deduction for 1954 in the amount of $3,823.57 under section 162(a) for accounting services, contending that they were ordinary and necessary expenses in carrying on its business. These payments were made by the partnership in February, June, and on September 14, 1954, in the amounts of $1,000, $1,459.13, and $1,364.44, respectively, to the accounting firm of Harry M. Jay and Associates. The shopping center was opened for business on September 9, 1954. The accounting firm audited the construction contract during 1954 and checked all the invoices that supported each estimate submitted by the contractor to the partnership to see that they were proper. The firm checked the labor that was charged under the construction contract. The firm also prepared the initial property schedules which were entered on the partnership books and used to compute depreciation allowances. These property schedules were prepared by the accounting firm by separating the costs of construction into various components. The accounting firm did not set up the partnership books and did not maintain the books and records of the partnership, which were kept by the partnership's own bookkeeping staff. It is obvious that the accounting services in dispute were incurred as a part of the construction and preparation of the center. Expenditures of this type are an integral part of the total cost of the new buildings. Such costs do not benefit the year 1954 alone but continue inseparably with the buildings over their useful lives. We hold that these accounting expenses incurred by Lamar-Airways in 1954 were capital expenditures, section 263, and that they are not deductible under section 162(a).

Lamar-Airways claimed deductions under section 162(a) in 1954 and 1955 for cleaning services in the amounts of $2,372.79 and $1,777.92, respectively, as ordinary and necessary business expenses. Respondent disallowed $2,082.79 and $117.35 for the years 1954 and 1955, respectively, on the ground that these amounts were capital expenditures. At the trial the petitioners conceded that $589.63 of the amount paid for cleaning services in 1954 was properly capitalized, leaving the balance of $1,493.16 in dispute for that year. The amounts in dispute were paid by the contractor, who then included such amounts in his billings to the partnership. The 1954 cleaning expenses were paid to get the shopping center ready for its grand opening, and the 1955 cleaning expenses were probably paid in connection with the buildings constructed in that year, although this is not certain from the record. We do not believe that these cleaning expenses, which were included as job costs by the contractor in his billings to the partnership, are any different from the other expenditures which made up the job costs. Such expenditures are capital in nature. Petitioners have not introduced any evidence to the contrary. We sustain the respondent on this issue.

Lamar-Airways, in its return of income for 1954, claimed a deduction for insurance expense in the amount of $9,639.59 as an ordinary and necessary expense. It was stipulated that a portion of this amount, $7,889.59, should be capitalized, leaving $1,750 in issue. The amount in dispute represents premiums paid by Lamar-Airways to the Herman Gruber Company for fire and extended coverage insurance on the buildings in the shopping center during their construction. The insurance payment was an obligation of the partnership under the terms of its contract with the construction company. At the trial one of the petitioners acknowledged that this insurance was on the buildings during the process of construction. This expenditure in connection with the acquisition of a capital asset, i.e., the shopping center buildings, is a capital expenditure and not an ordinary and necessary expense of carrying on business. *Columbia Theatre Co.*, 3 B.T.A. 622. We sustain the respondent on this issue.

Lamar-Airways claimed a deduction in 1955 in the amount of $250 which was paid for a survey of the shopping center premises. Nathan, one of the petitioners, testified that he did not "know who did the survey but it was in connection with conversations about some financing that we didn't make at the time." Apparently nothing came of these conversations because in the following year the partnership paid an additional fee to get a further survey for a permanent loan. We agree with petitioners that this expenditure is an ordinary and necessary business expense. Financing is quite obviously a necessary and vital concern of a large business operation

of this kind and we think that a survey of this sort is one that would ordinarily be made in connection with such financing. Respondent's contention that this is a capital expenditure is without merit. The survey was not made in connection with the acquisition of property. We sustain the petitioners on this issue.

In 1954 Lamar-Airways paid $411.73 for wooden benches and $209.92 for metal waste receptacles to be used in the shopping center. A deduction was claimed as supplies for this entire amount. It has now been stipulated that the entire amount should be capitalized and the only remaining dispute is over the useful life to be attributed to these items, with respondent giving them a 10-year useful life and petitioners a 5-year useful life. Both the receptacles and the benches are outdoors, exposed to the elements and to buffeting by vehicles. The benches are of heavy wooden construction, while the receptacles are made from metal with a flap opening. Petitioners' witness, in a deposition, stated that in his opinion "the waste cans will do well if they last five years, and the benches by proper maintenance could last ten." At another point he stated that "if we can keep them [the benches] repaired to the point where we can use them for the next two or three years we will be lucky." This would give the benches a useful life of approximately 7 or 8 years. He also stated that some of the receptacles had already been replaced at the time of the trial. Respondent introduced no evidence as to this useful life of these items. We hold that the useful life of the benches is 8 years and that of the receptacles is 5 years.

In 1954 Lamar-Airways paid $1,116.50 for the planning, purchase, and planting of shrubbery on the shopping center premises, and as far as we can tell from the record this amount was included in the cost basis of the shopping center buildings. Respondent eliminated this amount from the cost basis, and in his brief he makes the argument that "this expenditure should be added to the cost of the land as a non-depreciable asset; and in the alternative, if the Court should determine that the expenditure represents an asset, subject to depreciation, then the partnership is still not entitled to depreciate its cost, since the useful life of the perennial shrubbery has not been established." Petitioners claim that the useful life of the "landscaping" is 10 to 15 years. The partnership planted evergreens and other shrubbery which a witness described as "good heavy hardy shrubs" and "perennials." Landscaping of this kind is inextricably associated with the land which, of course, is a nondepreciable asset. In *Algernon Blair, Inc.*, 29 T.C. 1205, this Court held that the costs of "landscaping, including planting of grass and shrubs," were nondepreciable since such costs were related more

closely to the land than to the buildings. We sustain the respondent on this issue.

Lamar-Airways computed its deductions for depreciation for the years 1954 and 1955 on a component grouping method. This was done by segregating into groups the structure of the buildings, roofs, floors, wiring, plumbing, ceilings, air conditioners, and miscellaneous items. A useful life of 40 years was assigned to the structures accounts, 15 years to the filling station building, and useful lives of 10 or 15 years to each of the other groupings. Depreciation was then computed for each group on the declining balance method at twice the straight line rate. Respondent, in his notice of deficiency, computed the depreciation allowance on the four buildings in the center on a composite basis, assigning a useful life of 40 years to the Main Building, Professional Building, and Goodyear Building, and a useful life of 25 years to the filling station. Respondent used the declining balance method at twice the straight line rate which had been elected by the partnership, except with respect to the construction in process at December 31, 1953. He limited depreciation on this portion to one and one-half times the straight line rate.

Petitioners make no argument on brief as to the respondent's treatment of property in construction on December 31, 1953. Section 167(b), which permits the use of the 200 per cent declining balance method, is applicable only to taxable years ending after December 31, 1953. Section 167(c) provides that the 200 per cent declining balance method shall apply to property "the construction, reconstruction, or erection of which is completed after December 31, 1953, and then only to that portion of the basis which is properly attributable to such construction, reconstruction, or erection after December 31, 1953." Under the Internal Revenue Code of 1939 neither the statute nor the regulations mentioned the declining balance method, but the respondent had ruled that the declining balance method would be approved if it resulted in a reasonable depreciation allowance. I.T. 3818, 1946-2 C.B. 42. In his regulations under section 167 the respondent provided as follows: "Methods previously found adequate to produce a reasonable allowance under the Internal Revenue Code of 1939 or prior revenue laws will, if used consistently by the taxpayer, continue to be acceptable under section 167(a). Examples of such methods which continue to be acceptable are the straight line method, the declining balance method with the rate limited to 150 percent of the applicable straight line rate * * *." Sec. 1.167(b)-0(b), Income Tax Regs. In Revenue Ruling 57-352, the respondent ruled that for taxable years ending after December 31, 1953, "the declining balance method of computing depre-

ciation, using a rate not in excess of one and one-half times (150 percent) the applicable straight line rate, may continue to be used for new or used tangible property acquired prior to January 1, 1954, and used tangible property acquired after December 31, 1953, provided such method results in a reasonable allowance for depreciation." Petitioners offer no reason why the respondent's interpretation of section 167 is unreasonable. Respondent is sustained in his determination as to the assets in construction as of December 31, 1953.

We see no reason why Lamar-Airways should be compelled to change from the component grouping method to a composite method. No real justification is given for this compulsory change by the respondent, and, absent any such justification, we do not believe that the choice made by the partnership should be disturbed. Respondent admits that the partnership had the right under the regulations to use a component method. Sec. 1.167(a)-7, Income Tax Regs. Petitioners introduced several witnesses who testified as to the useful lives of each of the component groups of assets. These witnesses were very familiar with various phases of the construction, real estate, and retailing businesses. There was evidence as to the type of construction used, the nature of the shopping center business, with emphasis on its uncertainty, and the experience with other shopping centers in the area. There was testimony that new tenants in shopping centers frequently require substantial modernization before moving in, and that this often entailed complete rewiring, replacement of ceilings, replacement of store fronts to meet new demands, removal of walls, and other changes. This testimony was especially significant in view of the fact that 12 of the leases in the center, out of a total of 17, were for only 10 years and that only 3 of these had an option to renew. The useful life of an asset for purposes of section 167 is the period over which the asset may be expected to be useful to the taxpayer in his particular business, and to determine such useful life, we must examine such factors as wear and tear from natural causes, economic changes and developments within the business, conditions peculiar to the taxpayer's business, and the taxpayer's policy as to repairs and replacements. We have examined the evidence carefully and we believe it supports, for the most part, the estimated useful lives assigned by the partnership to the various component groups of assets. We have included in our findings the various useful lives adopted by the partnership, and, with the exception noted below, we find that they are reasonable and correct, and we so hold. We believe that, on the basis of the evidence, the useful life of the tar and gravel roofs is 15 years rather than 10 years, and we so hold.

The medical deduction issue in Docket No. 71618 depends upon the outcome of the above issues, and it can be handled by the parties in the Rule 50 computation.

*Decisions will be entered under Rule 50.*