**TRANSAMERICA CORPORATION,**
a corporation, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

Civ. No. 42548.

United States District Court
N. D. California, S. D.

May 20, 1966.

George Koster, of Koster, Kohlmeier & Graham, San Francisco, Cal., for plaintiff.

Richard Carico, Asst. U. S. Atty., San Francisco, Cal., for defendant.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

This is an action brought by Transamerica Corporation (hereinafter referred to as Transamerica) pursuant to the provisions of 68A Stat. 876 (1954), 26 U.S.C. Sec. 7422 (1964) and 62 Stat. 933 (1948), 28 U.S.C. Sec. 1346(a) (1) (1964) for a refund of federal income taxes for the calendar year 1958.

Jurisdiction is invoked under the provisions of 28 U.S.C. Secs. 2401–2402 (1964).

This case is submitted for decision on the pleadings, a Stipulation of Facts, filed on December 8, 1965, with certain exhibits incorporated, and the testimony of one witness, William E. Butts, taken by deposition and the exhibits accompanying said deposition.

The Stipulation of Facts shows that on June 6, 1963, Transamerica filed a claim for refund of income taxes paid for the year 1958 in the amount of "$107,-093.55 or such other or greater amount as may be legally refundable" alleging two separate grounds for said refund (Stipulation of Facts Ex. B):

(1) That Transamerica had incurred certain business expense in connection with its decision to divest itself of its bank stocks; that as permitted by the Bank Holding Company Act of 1956, 70 Stat. 130, 12 U.S.C. Secs. 1841–1848 (1964) it organized a new corporation, Firstamerica Corporation, to which it transferred its bank stocks in exchange for all of the capital stock of Firstamerica Corporation; that Transamerica

then spun off its Firstamerica Corporation stock by distributing the same to its stockholders as a dividend in kind in the year 1958; that in connection with the spin-off, Transamerica incurred expenses consisting of legal fees, transfer agent fees, printing costs, insurance on Firstamerica shares distributed and other expenses, all relating to the distribution of the Firstamerica Corporation stock, which expenses amounted to $161,642.45; that Transamerica claimed a deduction for said expenses in its federal income tax return for the calendar year 1958; that said deduction was disallowed by the Commissioner and a deficiency made against Transamerica for the tax due as a result of the disallowance; and after this deficiency was paid, Transamerica claimed a refund for the tax assessed by reason of the disallowance of this deduction.

(2) That in 1958 General Metals Corporation (an affiliate of Transamerica and included in Transamerica's 1958 consolidated tax return) donated to the City of Oakland certain land having a cost basis to that company of $5560.00 and a fair market value in excess thereof, to be used as a street and also $31,118.93 in cash to partly pay the cost of paving the street; that Transamerica claimed this as a contributions deduction but, the Commissioner disallowed the deduction on the ground that the contribution was a capital expenditure since the taxpayer owned land on both sides of the street.

The complaint herein prays for recovery of the sum of "$107,093.55, or such other amount as is found to be legally refundable," as income taxes erroneously and illegally collected from plaintiff for the year 1958.

THE DIVESTITURE ISSUE

The Bank Holding Company Act of 1956, which became law on May 9, 1956, contained a broad prohibition against the continued ownership and control by a bank holding company of both banking and non-banking businesses.

Transamerica concluded that its best interests would be met by a reorganization plan under which it would cease to be a bank holding company while continuing to hold its non-banking interests. This was accomplished by divesting itself of its banking stocks.

In carrying out its decision to divest itself of its bank stock, Transamerica developed a plan which it described as "a plan of reorganization," under which it caused Firstamerica Corporation to be organized, transferred to Firstamerica its bank stocks, together with 20 million in cash, in return for 11,372,022 shares of Firstamerica stock and immediately thereafter distributed all its shares of Firstamerica to Transamerica stockholders, over 100,000 of them, on the basis of one share of Firstamerica for each share of Transamerica.

No outstanding shares of Transamerica were redeemed or transferred and no additional shares of Transamerica were issued.

No change was made in the corporate charter or corporate capital stock structure of Transamerica, nor did it acquire any money or other tangible assets, or improve any such assets. The number of Transamerica shares outstanding, and the par value thereof remained the same.

Stocks of banking subsidiaries having a book value of 148 million plus 20 million in cash, were transferred to Firstamerica in exchange for Firstamerica stock which, when distributed to Transamerica stockholders, eliminated Transamerica's paid in surplus of 117 million and reduced its earned surplus from 100 million to 51 million and, further, affected the book value of Transamerica shares downward from $21.19 per share to $6.37 per share.

On the other hand, Firstamerica acquired a capital stock of 22 million, a paid in surplus of 94 million and an allocated earned surplus of 49 million and its stock in the hands of Transamerica shareholders showed a book value of $14.82 per share.

According to Transamerica's Proxy Statement (Stipulation of Facts, Ex. H), "Immediately after the distribution, the

stockholders of Transamerica will be the owners of two corporations which will own the same assets owned by Transamerica immediately prior to the distribution. The two corporations will be Transamerica Corporation and Firstamerica Corporation, which has been organized to receive the property proposed to be transferred under the plan."

Under this plan it was also provided that no director of Transamerica or any of its subsidiaries would be a director or officer of Firstamerica Corporation or any of its subsidiaries.

This plan of divestiture was patterned to meet the provisions of an act entitled "Distribution Pursuant to Bank Holding Company Act of 1956" 70 Stat. 139, 26 U.S.C. Secs. 1101–1103 (1964) enacted by the Congress to provide methods whereby distributions made pursuant to the Bank Holding Company Act could be made without involving tax consequences to the recipient for ordinary taxable income or for taxable capital gains which might prove to be virtually confiscatory.

None of the claimed expenses relate to the organization of Firstamerica Company or to its corporate charter, capital structure or issuance of its stock. Those expenses were paid by Firstamerica Corporation.

The claimed deductible expenses are limited to those incurred in working out and consummating the plan for divestiture of Transamerica's bank stock assets and the distribution by Transamerica of the Firstamerica stock, which Transamerica had acquired as an asset from Firstamerica, to its own stockholders.

Plaintiff contends that the sole and in any event the dominant purpose of the divestiture transaction here involved was merely and solely to make the election put to it by the Bank Holding Company Act to liquidate either its bank or nonbank assets and that the actual expenses incurred in connection with this partial liquidation should be held to be necessary and ordinary business expenses and as such deductible under 26 U.S.C. Sec. 162(a) providing in part: "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *."

On the other hand, defendant contends that the distributions should be considered in the nature of a corporate reorganization—a change in corporate structure —rather than a mere partial liquidation and therefore, non-deductible under the rule that such reorganization expenses are capital expenses rather than necessary and ordinary business expenses and as such non-deductible under Sec. 162(a).

Just what constitutes an ordinary and necessary business expense within the meaning of Sec. 162(a) is not determinable by any specific formula. As stated by Justice Cardozo in Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933): "The standard set up by the statute is not a rule of law; it is rather a way of life. Life in its fullness must supply the answer to the riddle."

In a certain sense it may be said that it is not ordinary, but most extraordinary, for a corporation to have to exercise a choice by which it divests itself of its main, substantial assets without receiving anything in return.

However, the mere fact that such a partial liquidation does not frequently occur does not necessarily render its expense thereof extraordinary rather than ordinary.

In its most recent consideration of deductibility of necessary and ordinary business expenses, the Supreme Court in Commissioner v. Tellier, 86 S.Ct. 1118 (March 24, 1966), held that legal expenses for an unsuccessful defense of a criminal prosecution for violation of the fraud section of the Securities Act and mail fraud statute were deductible as ordinary and necessary expenses of a trade or business within the meaning of Section 162, saying at 1120:

" * * * Our decisions have consistently construed the term 'necessary' as imposing only the minimal require-

ment that the expense be 'appropriate and helpful' for 'the development of the (taxpayer's) business.' Welch v. Helvering, 290 U.S. 111, 113, [54 S.Ct. 8, 9, 78 L.Ed. 212]. Cf. Kornhauser v. United States, supra, [276 U.S. 145, at 152, 48 S.Ct. 219, 72 L.Ed. 505]; Lilly v. Commissioner, 343 U.S. 90, 93–94, [72 S.Ct. 497, 499, 96 L.Ed. 769]; Commissioner v. Heininger, 320 U.S. 467, 471, [64 S.Ct. 249, 252, 88 L.Ed. 171]; McCulloch v. Maryland, 4 Wheat. 316, 413–415, [4 L.Ed. 579]. The principal function of the term 'ordinary' in § 162(a) is to clarify the distinction, often difficult, between those expenses that are currently deductible and those that are in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset. Welch v. Helvering, supra, [290 U.S.] at 113–116, [54 S.Ct. 8–10]. The legal expenses deducted by the respondent were not capital expenditures. They were incurred in his defense against charges of past criminal conduct, not in the acquisition of a capital asset. Our decisions establish that counsel fees comparable to those here involved are ordinary business expenses, even though a 'lawsuit affecting the safety of a business may happen once in a lifetime.' Welch v. Helvering, supra, [290 U.S.] at 114, [54 S.Ct. at 9]. Kornhauser v. United States, supra, [276 U.S.] at 152–153, [48 S.Ct. at 220]; cf. Trust of Bingham v. Commissioner, 325 U.S. 365, 376, [65 S.Ct. 1232, 1238, 89 L.Ed. 1670]."

The determination of what expenses are ordinary expenses must be made in the light of the nature of the business— in this case a bank holding company constantly subject as such to governmental scrutiny and regulation of the kind evident in the Bank Holding Company Act of 1956 and constantly subject to such expense as may be necessary to preserve its business by keeping it in compliance with such regulation. Deputy v. DuPont, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940). See also 4 Mertens Law of Income Taxation Sec. 25.09 (1960 and 1965 Supp.)

In the pending case it became necessary for the taxpayer in the course of its business life to incur the expense of a partial liquidation of its assets.

■ It is well established that the mere fact that expenses have been incurred in order to comply with a statute, ordinance or court order does not in and of itself make the expense a deductible business expense. If, in fact, the statutorily required expense constitutes a capital improvement that increases the value of the property for use in the business—an improvement or betterment having a useful life of more than the year of construction—then it cannot be claimed as a necessary and ordinary business expense.

The Court of Claims has held in RKO Theatres, Inc. v. United States, 163 F. Supp. 598, 602, 143 Ct.Cl. 39 (1958), concerning expenses in compliance with the safety order of a public official:

"They were ordinary and necessary expenditures in the sense of a normal reaction of an owner to a governmental safety requirement for the operation of a profitable business. * * But, putting in fireproof doors * * are not the 'ordinary and necessary expenses' of carrying on a business * * *. This was not a repair * * * but a capital improvement made to increase the value of the property for use in the taxpayer's theatre business."

The basic question is whether, apart from the alternatives presented to Transamerica by the Bank Holding Company Act of 1956, the expenses of its liquidation of bank stock assets are of such nature that they should be considered as ordinary and necessary business expenses rather than capital expenditures.

■ It is well settled that expenditures for corporate organization or reorganization are capital expenses for the reason that by such expenditure the corporation changes its corporate structure and thereby acquires an intangible asset

for the benefit of its future operations. (See 4 Mertens Law of Income Taxation Sec. 25.35 (1960)).

It has been held accordingly that expense of a corporate taxpayer distributing to its stockholders warrants to subscribe for the common stock of its subsidiary as part of a plan to comply with an order of the Delaware Chancery Court, were capital expenses, Missouri-Kansas Pipe Line Co. v. Commissioner, 148 F.2d 460 (3rd Cir. 1945); that attorney fee expenses incurred by a corporation in connection with its merger with another corporation were capital expenses, Motion Picture Capital Corp. v. Commissioner, 80 F.2d 872 (2d Cir. 1936); that expenses incurred in issuing non-taxable stock dividends were capital expenses, General Bancshares Corp. v. Commissioner, 326 F.2d 712 (8th Cir. 1964); that recapitalization expenses incurred to give a corporation the capital structure best suited to carry on its business were capital expenses, Mills Estate, Inc. v. Commissioner, 206 F.2d 244 (2d Cir. 1953).

On the other hand, it has been held that expenses incurred in connection with partial liquidations constitute ordinary and necessary business expenses within the meaning of Section 162(a). Pacific Coast Biscuit Co. v. Commissioner, 32 B.T.A. 39 (1935); Tobacco Products Export Corp. v. Commissioner, 18 T.C. 1100 (1952); Standard Linen Service Inc. v. Commissioner, 33 T.C. 1 (1959); Mills Estate, Inc. v. Commissioner, 17 T.C. 910 (1951), rev'd 206 F.2d 244 (2d Cir. 1953) infra; 4 Mertens Law of Income Taxation Sec. 25.35, at 120, 126, 128 (1960 ed. and 1965 Supp.); Weissman, Allowable Deductions of the Formation, Reorganization and Liquidation of a Corporation, 53 Northwestern U.L.Rev. 681, 714, 716, 719–22, 724 (1959); Comment, Attorneys' Fees For Partial Liquidation: Business Expense or Capital Asset? 6 Stan.L.Rev. 368 (1954).

In some cases the question has arisen whether expenses of partial liquidation can be deducted as necessary and ordinary business expenses when the partial liquidation has involved or been accompanied by a corporate reorganization—a change of corporate structure. Mills Estate, Inc. v. Commissioner, 206 F.2d 244 (2d Cir. 1953); Farmers Union Corp. v. Commissioner, 300 F.2d 197 (9th Cir. 1962); Gravois Planing Mill Co. v. Commissioner, 299 F.2d 199 (8th Cir. 1962).

In Mills Estate, Inc. v. Commissioner, supra, a corporation decided to go out of the real estate part of its business and, having turned its real estate into cash, distributed the cash to its shareholders. New York law, however, required that it change its capital structure. It therefore, underwent a recapitalization to give itself the capital structure best suited to carry on that part of the business it was to continue. Attorney fees were incurred to that end. The Court held that such expenses were part of expenditures needed to give the corporation an intangible asset, i. e., its altered corporate structure, and, as such, constituted an expenditure capital in nature. Without deciding whether expenses of a complete or partial liquidation are deductible as a business expense, the Court based its holding upon the fact that the taxpayer had not met the burden of showing that the expenses were merely for the distribution of the cash to the shareholders and, therefore, the expenses would be treated as essentially for corporate reorganization.

In Farmers Union Corp. v. Commissioner, supra, the Tax Court had found that a transaction whereby a corporate taxpayer transferred inventory and related assets of retail hardware business to seven of its shareholders, in return for 8,000 of its 20,000 shares of stock (an obvious change of corporate structure) was for income tax purposes a partial liquidation on which no loss could be recognized as distinguished from a sale of the inventory. On appeal, the Court of Appeals for the Ninth Circuit held that this finding was not clearly erroneous but held further, that expenses incurred in connection with the partial liquidation were not deductible as business expenses

because expenses incurred for the purpose of changing the corporate structure for the benefit of future operations are not ordinary and necessary business expenses, citing Motion Picture Capital Corp. v. Commissioner, supra; Missouri-Kansas Pipe Line Co. v. Commissioner, supra; Mills Estate, Inc. v. Commissioner, supra.

However, the Court states, at 300 F.2d 200:

"This is not to say that expenses incurred in carrying out a partial liquidation are never ordinary and necessary business expenses (see Mills Estate, Inc. v. Commissioner, supra, 2 Cir., 1953, 206 F.2d 244; Standard Linen Service, Inc. v. Commissioner, 33 T.C. 1, 7 (1959)), but the taxpayer has not sustained its burden, for it has conceded both in the Tax Court and on this appeal that the deductibility of the expenses depends solely on whether there was a partial liquidation or sale."

With the background of law fairly reflected in the above decisions, the question presented in the case at hand is whether the sole, or at least dominant purpose of the particular divestiture distribution here involved was a partial distribution of its assets to its shareholders unaccompanied by the creation or improvement of any asset, either tangible or intangible to Transamerica, the taxpayer.

This Court is mindful of the guiding rule that, unless a question of law is unmistakably involved, an agency ruling on a point of business expense deduction should not be reversed and that careful adherence to this rule will result in a more orderly and uniform system of tax deduction in a field necessarily beset by innumerable complexities. See, Missouri-Kansas Pipe Line Co. v. Commissioner, supra; Commissioner v. Scottish American Inv. Co., Ltd., 323 U.S. 119, 65 S.Ct. 169, 89 L.Ed. 113 (1944).

Although the question whether a corporate transaction is a partial distribution of its assets or a reorganization of its corporate structure for future business purposes, or both, is ordinarily a question of fact, the facts here involved, recorded as they are in formal documents and proceedings, are so clear, undisputed and so susceptible of but one factual inference that the parties have made them the subject of a stipulation.

The resolution of the question here presented depends solely upon whether under the law Transamerica has been mistakenly denied deduction for the ordinary corporate expense incurred in connection with a partial liquidation of its assets to its shareholders—a partial distribution which upon the record before us does not appear to have been accompanied by the creation or improvement of any tangible asset or by the creation or improvement of any intangible asset with respect to change of its corporate structure for the benefit of the taxpayer's future operation.

Partial corporate liquidations are dealt with in Subchapter C of the Internal Revenue Code, 26 U.S.C. Secs. 331, 346 (similar to Secs. 115(c) and 115(i) of the 1939 Internal Revenue Code). The purpose of those provisions is to describe certain kinds of partial liquidations in redemption of the corporation's stock which shall be treated as in part or full payment in exchange for stock and taxable as capital gain or loss as distinguished from ordinary income.

Transamerica does not contend that the divestiture distribution herein was of the kind set forth in Sec. 346, nor is any question here involved concerning ordinary income or capital gain or loss consequences to the recipients of the distributions. Transamerica does contend, however, that the distribution here involved was, nevertheless, a partial liquidation of its assets made under the provisions of the act entitled "Distributions Pursuant to Stock Holding Company Act of 1956" 26 U.S.C. Secs. 1101–1103 (1964). The only tax question here involved is the deductibility of the ordinary, corporate expense involved in making such a distribution of its assets in partial liquidation.

If Transamerica had simply sold its bank stocks and then distributed the proceeds to its shareholders in the form of a cash dividend, it would have been entitled, at least, to deduction of the ordinary corporate expense incurred in distributing the cash dividend. Similarly, if it had merely distributed its bank stocks in kind to its shareholders, it would have been entitled to deduction of the ordinary expenses thereof.

Similarly, if Transamerica had chosen to distribute its bank stocks under the form of the partial liquidation contemplated by 26 U.S.C. § 346, it could have claimed at least deduction of expenses incurred therein under decisions holding that such expense may be deducted as business expense.

Any of the above procedures would have involved serious tax consequences to Transamerica and its shareholders, not concerning deduction of the expenses therefor, but concerning whether the bank stock assets received in any of these three forms would have constituted either ordinary taxable income or at least a taxable capital gain.

For the specific purpose of eliminating any and all such tax consequences, the Congress enacted the internal revenue companion legislation to the Bank Holding Company Act—the "Distributions Pursuant to Bank Holding Act of 1956", 26 U.S.C. §§ 1101–1103.

We are not concerned in this case with the ordinary income vis a vis capital gain tax consequences of a partial distribution of corporate assets. The Congress has taken care of that problem so far as this particular distribution is concerned.

We are here concerned only with the question of the right to deduct for income tax purposes the necessary and ordinary expense involved in the corporate making of such a liquidation—whether in the form of a cash dividend or a dividend in kind or in the form here involved.

Transamerica naturally and rightfully made the partial liquidation of its bank stock assets under a plan especially tailored by the Congress to prevent both ordinary income and capital gain consequences to its shareholders.

Under this plan Transamerica's bank stock assets came into the hands of its shareholders, not in the form of a cash dividend or a dividend in kind, but in the form of Firstamerica stock.

There can be no doubt, however, that Transamerica did divest itself of and turn over to its stockholders a substantial segment of its assets, its bank stocks, constituting what the Bank Holding Company Act of 1956 evidently regarded as a line of business different in kind from its business in non-bank stock assets—an actual, substantial and vertical termination of one of its business lines with corresponding contraction of its operations.

The net effect of the distribution, so far as Transamerica is concerned, was the same as if its bank stock assets were turned over to its shareholders in the form of cash or in kind.

The real issue here is, not whether there was a partial liquidation of assets by Transamerica, but whether this partial liquidation so involved or was so accompanied by such a change of corporate structure for the benefit of future operations as would render the expense thereof more in the nature of capital expenditure than necessary and ordinary business expense.

Defendant contends that such is the case because the net effect of the liquidation was that Transamerica "merely divided its former business into two corporations" (Def. Reply Brief p. 9) and that its stockholders then "became the owners of two corporations—Transamerica and Firstamerica—which together owned precisely the same assets that had been owned by Transamerica immediately before the distribution. The only change was that their equities were evidenced by certificates of stock of two corporations instead of one. Thus, the reorganization left intact (the) stockholders' interests in the substantial values underlying all the corporation's investments." (Def. Reply Brief p. 4).

This argument would be impressive if the plan contemplated the creation of the new Firstamerica Corporation as an owned or controlled subsidiary of Transamerica.

It is true that under the plan of divestiture Transamerica became momentarily the parent of a subsidiary, Firstamerica, but obviously only as a conduit for immediate redistribution of the Firstamerica stock to Transamerica shareholders. After this redistribution, Transamerica could not be considered a parent, nor Firstamerica its subsidiary. The corporations became wholly distinct, not only in corporate structure but in fact under provisions barring common directorship and officers. The only relationship between the two corporations arose through the common shareholdership immediately following the distribution of the Firstamerica stock—a relationship, however, which became at once subject to change as a result of normal transfers of stock ownership.

It is true that the plan involved organization of Firstamerica Corporation and the expense incident thereto. Such organizational expense, if paid by either Firstamerica or Transamerica, would concededly be capital expense. But, Transamerica makes no claim here for deduction of any such expense which was in fact paid by Firstamerica.

Defendant also contends that the reflection of this liquidation in reduction of the earned surplus and part of the paid-in surplus of Transamerica amounts to such a change of corporate structure as would render the liquidation expenses capital in nature. We do not agree with this contention. Any distribution or liquidation of assets, whether in the form of an ordinary cash dividend or a dividend in kind, must necessarily be reflected in the books of the corporation as a reduction of the account to which it is charged—in this case the earned and paid in surplus and a reduction of the book or equity value of the outstanding shares.

Whether a distribution or liquidation of assets is made out of some surplus or out of stated capital may have an important bearing (unless, as in this case, resolved by special legislation) on other tax consequences of the liquidation or distribution but it does not necessarily render the ordinary incidental, more or less mechanical expense thereof capital expense—unless accompanied by some real change of corporate structure that may be of benefit to the taxpayer corporation in its future operations.

The only corporate structural changes were the creation of the new, corporately separate Firstamerica, and the new, but also separate, relationship between Transamerica's shareholders at the time of distribution and Firstamerica. There was no change in the corporate structure of the taxpayer, Transamerica, and, further, any benefit for the future of the existence of Firstamerica and its new shareholders accrued to Firstamerica and its shareholders—not to Transamerica.

It is true that under this plan of divestiture Transamerica's corporate charter and capital stock remained intact for Transamerica's future operations in non-bank stocks. But, the expenses of the divestiture cannot be said to have added anything more of value in the way of corporate structure than Transamerica already had. On the contrary, its decision to divest itself of one line of its business—bank stock investments—pursuant to the Bank Holding Company Act of 1956, restricted the use of its corporate charter and capital and to that extent actually lessened their intangible value for the future.

■ For the foregoing reasons the Court finds and concludes from the record herein that all the claimed deductible expenses related to and were part of the plan under which Transamerica liquidated and distributed its bank stock assets; that plaintiff has met the burden of proving, and the fact is, that said plan did not involve, nor was it accompanied by, the creation or improvement of any tangible asset to Transamerica the expenses of which could or should be capitalized; that it did not involve, nor was it accompanied by, the creation of any

intangible asset in the nature of change of corporate structure for the benefit of Transamerica in its future operations the expense of which could or should be capitalized; that said expenses were necessary and ordinary expenses of the business of Transamerica and were properly deductible as such under Sec. 162(a).

Even if we were to assume that some element or phase of this plan of liquidation should be considered in some sense a change of corporate structure, or that Transamerica had accompanied the liquidation with a recapitalization reduction of its stated capital, the Court, nevertheless, finds and concludes that plaintiff has met the burden of proving and the fact is, that the evident, dominant purpose of said plan of liquidation was the divestiture and liquidation of Transamerica's bank stocks in the necessary and ordinary course of its business and that any such change of corporate structure was wholly incidental, minor and insubstantial as far as the taxpayer Transamerica was concerned. See Gravois Planing Mill Co. v. Commissioner, supra.

A question is raised by defendant whether in any event plaintiff may in this suit include as part of such divestiture expense an item of $14,404.20 expended for documentary stamps. Defendant points out that Transamerica's claim of refund, as filed with the Commissioner on June 6, 1963, neither mentioned that item nor included it in the stated total amount of divestiture expenses, (i. e., $161,642) set forth in the refund claim.

The statute requiring a refund claim to be filed with the Commissioner prior to maintaining a suit in the district court is 26 U.S.C. Sec. 7422. The regulations promulgated thereunder provide, in part: "The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." Treas.Reg. Sec. 301.-6402–2(b) (1955).

The claim for refund (Stipulation of Facts, Ex. B) did set forth in detail each ground upon which plaintiff claimed a refund and did set forth facts sufficient to apprise the Commissioner of the exact basis thereof.

The claim prayed for a total refund of taxes in the amount of "$107,093.55 or such other or greater amount as may be legally refundable"—an amount identical with the amount claimed and prayed in the pending suit.

The expenses of the divestiture, which the plaintiff claimed had been improperly disallowed, were stated as "legal fees, transfer agent fees, printing costs, insurance * * * and *other expenses* all relating to the distribution of the First-america Corporation stock by Transamerica to its shareholders."

The mere failure by oversight to specify and include "documentary stamps" and to understate the total of divestiture expenses by $14,404.20 does not preclude recovery of that amount in this suit if plaintiff is otherwise entitled —particularly in this case wherein the record shows the Commissioner's knowledge as of his November 6, 1962 audit of the taxpayer's 1958 and 1959 returns, that an item of $14,404.20 for documentary stamps had been claimed in Transamerica's 1959 return as part of the expenses of the 1958 distribution, but was disallowed. See Stipulation of Facts, Ex. A. See also Burrell v. Fahs, 232 F.2d 163 (5th Cir. 1956).

The Court, therefore, concludes that plaintiff may in this suit, include as part of such divestiture expense the item of $14,404.20 expended for documentary stamps.

## CONTRIBUTION TO THE CITY OF OAKLAND ISSUE

On the issue whether the contribution of certain land and monies to the City of Oakland by Transamerica's affiliate General Metals Corporation is deductible, the parties have stipulated to the following facts:

"In 1929, General Metals Corporation acquired certain real property in

Oakland, California. On January 1, 1958, this property consisted of 95.76 acres including a strip of property referred to herein as 85th Avenue as indicated on the map attached hereto as Exhibit J (Butts' deposition, Exhibit 1). This strip extends from Edes Avenue to Railroad, and as shown on Exhibit J substantial parts of the total acreage were located on each side of 85th Avenue.

From the time of acquisition of the property until February 17, 1958, General Metals Corporation maintained the strip of property referred to as 85th Avenue as a street which was used in part in connection with its manufacturing activities on its property but was also used by its employees and other people.

Under date of February 17, 1958, General Metals Corporation entered into a written agreement regarding 85th Avenue with the City of Oakland, a copy of which agreement together with the resolution of the City Council approving said contract, and a map showing the property involved, is attached hereto as Exhibit K (Butts' deposition, Exhibit 5).

In the year 1958, the aforesaid agreement was carried out and General Metals Corporation delivered to the City of Oakland a deed, a copy of which is attached as Exhibit L (Butts' deposition, Exhibit 5), and also paid to the City of Oakland $30,221.64 in cash. In addition, General Metals Corporation paid the City of Oakland an amount of $3,000.00 in cash to be used by the City towards improvement on the portion of 85th Avenue bordering property owned by other persons."

Transamerica contends that this contribution is deductible as a charitable contribution under 26 U.S.C. Sec. 170 (c) (1).

The stipulation on this issue is supplemented by the deposition of William E. Butts, former president of General Metals Corporation, whose testimony is to the effect that officials of the City of Oakland had "harassed", "badgered" and "threatened" the Corporation in an effort to get it to improve 85th Avenue, that maintenance was a continual problem to the corporation since 85th Avenue was unpaved, that the corporation had no intention of improving 85th Avenue for its own purposes as a street and that negotiations were finally entered into with the City of Oakland only because it was "inevitable" that something would have to be done about improving 85th Avenue.

The minutes of the Board of Directors of June 19, 1957 (Exhibit 4 to the Butts' deposition) state in part: "Further discussion was held on the *longstanding problem* of paving and transferring title of part of, and dedicating the remainder of the now existing 85th Avenue which is wholly owned by the Corporation." (emphasis added).

Transamerica concedes in its brief that the effect of the contribution was to relieve the Company of the continued costs of keeping the street in repair, to reduce City and County real estate taxes and to eliminate its risk of liability to people using the street.

■ The mere fact that the contribution was to a political subdivision of the State of California does not in and of itself, as contended by Transamerica, make such a contribution deductible under Section 170.

■ In order for a gift to qualify as a charitable contribution within the meaning of 26 U.S.C. Sec. 170 the incentive or motive behind the gift must be that of a "detached and disinterested generosity" or that of "affection, respect, admiration, charity or like impulses", Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); DeJong v. Commissioner, 309 F.2d 373 (9th Cir. 1962).

■ In the opinion of the Court the record on this issue does not sustain plaintiff's burden of proving that this contribution to the City of Oakland was made from a detached and disinterested generosity or from affection, respect, admiration, charity or like impulses, but,

rather for obvious business reasons, and was not a charitable contribution within the meaning of Sec. 170(c) (1) as interpreted by the above authorities.

Transamerica makes the alternative contention that the contribution was deductible as an ordinary and necessary business expense within the meaning of Sec. 162(a).

The government contends that the contribution represents a capital expenditure, not ordinary and necessary expense, pointing out that the beneficial effect to General Metals Corporation from the conveyance of 85th Avenue to the City of Oakland (e. g., accessibility to an adjoining street and the elimination of annual resurfacing costs) indicates a capital expediture the benefits of which will extend for more than one year—the usual dividing line between deductible expenses and capital expenditures.

The Court is of of the opinion that the value of the land and the contributed costs of making it a paved street are more in the nature of a capital expenditure than an ordinary and necessary business expense. See Chicago & Northwestern Ry. Co., 39 B.T.A. 661 (1939), aff'd 114 F.2d 882 (7th Cir. 1940); D. Loveman & Son Export Corp., 34 T.C. 776 (1960), aff'd 296 F.2d 732 (6th Cir. 1961).

Had Transamerica contracted with a private firm for the paving and maintenance of 85th Avenue for the indefinite future and in consideration thereof paid said firm $36,678.93 (the equivalent value of the instant contribution), there would be no question that said $36,678.93 would have to be capitalized by Transamerica.

█ Accordingly, the Court concludes that the aforesaid contribution to the City of Oakland is not deductible as an ordinary and necessary business expense within the meaning of Section 162(a) of the Internal Revenue Code.

This Memorandum of Decision contains the Findings of Fact and Conclusions of Law in accordance with Fed.R. Civ.P. 52.