539 F.2d 409
 76-2 USTC P 9672
 Jackson E. CAGLE, Jr. and Ann Cagle, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
Charles L. WEBSTER, Jr., and Sylvia Webster, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 Nos. 75-1722 and 75-1723.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 22, 1976.
 
 Robert S. Mizell, Robert C. Taylor, Dallas, Tex., for petitioners-appellants.
 Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Act. Chief, App. Sec., Bennet N. Hollander, William S. Estabrook, III, John G. Manning, Attys., Tax Div., Dept. of Justice, Meade Whitaker, Chief Counsel, Internal Revenue Service, Washington, D. C., for respondent-appellee.
 Appeals from the Decision of the Tax Court of the United States (Texas Cases).
 Before GEWIN, GODBOLD and SIMPSON, Circuit Judges.
 SIMPSON, Circuit Judge:
 
 
 1
 Taxpayers appeal from a ruling of the Tax Court upholding the Commissioner of Internal Revenue's finding of a deficiency in the federal income taxes for appellants. The findings of fact and opinion of the Tax Court are reported at 63 T.C. 86.
 
 
 2
 The sole issue presented on appeal is whether $90,000 paid by a partnership to its managing partner was a deductible expense under Section 707(c) of the Internal Revenue Code of 1954, Title 26, U.S.C., Section 707(c),[1] or a capital expenditure under Section 263(a) of the Code, and hence not deductible as an ordinary and necessary business expense.
 
 
 3
 We affirm the Tax Court.
 
 FACTS
 
 4
 Appellants Jackson E. Cagle, Jr. and Charles L. Webster[2] are practicing physicians who practiced their profession and maintained legal residences in Fort Worth, Texas, at all times pertinent to this appeal. Each filed his federal income tax return, Form 1040, for the calendar year 1968 with the District Director of Internal Revenue, Dallas, Texas.
 
 
 5
 Taxpayers were partners in a partnership known as Parkway Property Company, formed by a partnership agreement dated August 1, 1968. They were the investor partners and John F. Eulich was the managing partner. The purpose of the partnership, as stated by the agreement, was "to construct, acquire by purchase, own, hold, deal in, mortgage, operate, manage, equip, lease, sell, exchange, transfer or in any manner dispose of warehouses, office buildings, and other commercial property, and to do and perform all things necessary or incidental or connected with or growing out of such business." Articles of Partnership, Trial Record (hereinafter cited as R.) 34.
 
 
 6
 A primary intent of the partnership was the development of an office showroom of approximately 80,000 square feet, to be built on 5.255 acres of land (known as Parkway Plaza). Eulich was to contribute the land to the partnership. He did so, subject to an outstanding loan commitment obtained by him.
 
 
 7
 The partnership agreement specified that all interest and ad valorem taxes to be paid on the contributed real estate and all commissions, management compensations, and other expenses during the period August 31, 1968, to December 31, 1969, would be allocated 100% to the investor partners pro rata, but not in excess of $150,000. The agreement further provided that the managing partner, Eulich, was authorized to make expenditures in his own name for interest, taxes, fees, commissions, and other expenses on behalf of the partnership and would be entitled to reimbursement for such expense, but such expenditures were not to exceed $150,000 during the period August 1, 1968, to December 31, 1969.
 
 
 8
 The investor partners contributed $200,000 in cash, pursuant to the agreement, during the period August 1, 1968 to December 31, 1969, with the understanding that such funds would be used either to pay the above expenses directly or to reimburse Eulich for such payment.
 
 
 9
 The net profits, net gains resulting from the sale or disposition of any property held by the partnership, and net losses were to be divided among the partners as follows: John F. Eulich, 50%; Jackson E. Cagle, Jr., 25%; Charles L. Webster, Jr., 25%.
 
 
 10
 As the managing partner of Parkway Property Company, Eulich had "the right, power and authority to negotiate and execute leases and subleases for the purpose of improving the partnership property, to execute and deal with mortgages, notes and other instruments of indebtedness in his own name on behalf of the Partnership, or in the Partnership name, and may pay expenses, fees and costs of the Partnership in his own name for which he shall be entitled to reimbursement from the Partnership." R. 38. No partner was to receive any salary for services rendered on behalf of the partnership in a capacity as partner.
 
 
 11
 On August 15, 1968, the partnership entered into a management agreement with John F. Eulich doing business as the Vantage Company (hereinafter Vantage). The agreement provided that Vantage would receive for its services, as well as for expenses incurred by it in the performance of such services, the amount of $110,000, which was to be paid $90,000 on or before December 31, 1968, and $20,000 on or before October 1, 1969. In essence, Vantage was to utilize its expertise in the development and management of properties in such a way as to benefit the partnership company.[3]
 
 
 12
 Eulich testified at trial that he would not have agreed to form the partnership with appellants without payment of the $110,000 management fee. Vantage performed similar services for similar management fees for other partnerships investing in similar development projects.
 
 
 13
 The services performed for the partnership by Vantage included the following: A feasibility study of the office-showroom complex; work with the construction general contractors with respect to the cost of the project and coordination of the architecture and construction of the building; and the arrangement of financing using Eulich's own credit to some extent.
 
 
 14
 No portion of the management fee was for managing the property after it was completed. Rather, it was for work done at the inception and during the development of the office-showroom complex.
 
 
 15
 The development of the project went as follows: On September 24, 1968, Eulich purchased the 5.255 acres of land. On September 28, 1968, an architect firm was employed to draw up a plan for the complex and a photographer was hired to photograph the property. On October 31, 1968, a commitment letter for the construction loan was received. In November, 1968, several payments were made to the architect firm. On December 6, 1968, Eulich d/b/a Vantage borrowed $1,000,000 from the Prudential Insurance Company. On the same day a building permit was issued to the Dal-Tex Construction Company to construct the building shell, and a contract was awarded to the Van Company to finish the various suites of the office-showroom. By the end of 1968, there was no income-producing structure, and the first suite was not completed for occupancy until June, 1969, with the second suite being completed in July, 1969, the third suite in August, 1969, and two more suites in September, 1969.
 
 
 16
 There was no gross income reported on the Partnership's first return, covering the period from August 1, 1968, through December 31, 1969. The partnership deducted expenses totaling $105,972.51 which included the $90,000 paid to Vantage in 1968, listed on the partnership return as a "management fee". The $105,972.51 loss shown on the partnership return was distributed in accordance with the partnership agreement, with Cagle and his wife reporting a loss of $51,493, and Webster and his wife reporting a loss of $51,493.13, on their respective income tax returns for 1968.[4]
 
 
 17
 The Internal Revenue Commissioner, in his notice of deficiencies to both petitioners, "determined that the $90,000 deduction claimed as management fee is not allowable because it has not been established that such amount was paid for ordinary and necessary business expenses or that the expenses were incurred in carrying on an existing trade or business." Exhibit A, R. 15.
 
 DISCUSSION
 
 18
 As indicated above, the sole issue presented on appeal is whether the $90,000 paid to Eulich as managing partner was a deductible business expense to the partnership under Section 707(c) of the Code, or a capital expenditure not deductible as a business expense under Section 263(a) of the Code.
 
 
 19
 Taxpayers argue that Section 707(c) "results in deductibility regardless of the nature of the services performed or capital used if the payment involved is made without regard to partnership income." Reply Brief of Appellants, p. 2. We find this position untenable.
 
 Section 707(c) reads as follows:
 
 20
 (c) Guaranteed payments. To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and section 162(a) (relating to trade or business expenses). Stat. 243.
 
 
 21
 Taxpayers stress the legislative history of Section 707(c) in support of their position, quoting Senate Committee Report, 83d Cong., 2d Sess., S.Rep.No.1622 (1954) 386, U.S.Code Cong. & Admin.News 1954, p. 5029, which, in relevant part, reads:
 
 
 22
 Subsection (c) provides a rule with respect to guaranteed payments to members of a partnership. A partner who renders services to the partnership for a fixed salary, payable without regard to partnership income, shall be treated, to the extent of such amount, as one who is not a partner, and the partnership shall be allowed a deduction for a business expense. The amount of such payment shall be included in the partner's gross income, and shall not be considered a distributive share of partnership income or gain. A partner who is guaranteed a minimum annual amount for his services shall be treated as receiving a fixed payment in that amount.
 
 
 23
 The House provisions were amended by your committee to accord the same treatment as that provided in the case of guaranteed salaries to payments for the use of capital, to the extent the payments are determined without regard to partnership income. It should be noted that such payments, whether for services or for the use of capital, will be includible in the recipient's return for the taxable year with or within which the partnership year in which the payment was made, or accrued, ends.
 
 
 24
 Taxpayers contend that a finding differing from their position would be contrary to the clear intent of Congress, in light of the Committee Report, and, they argue, "would throw the partnership code provisions back into the very complications Congress was trying to avoid." We reject this contention. The Tax Court opinion offers insight into the prior status of partnership income tax treatment:
 
 
 25
 "Under prior law the tax treatment of compensation paid for a partner's services was generally based upon the so-called aggregate theory of partnerships. 7 (7 Under the aggregate theory the partnership is viewed as merely the aggregate of the activities of the individual partner as distinguished from viewing the partnership as an entity in itself.) Since a person could not be regarded as an employer and employee at the same time under this approach, a partner's compensation for services or salary was considered only a part of his distributive share of partnership profits or losses. Where partnership profits were sufficient, the compensation was treated as a distributive share of profits, Estate of S. U. Tilton, et al., 8 B.T.A. 914 (1927), with the result that such distributions were not proper deductions from income in computing partnership net income. Augustine M. Lloyd, 15 B.T.A. 82, 87 (1929).
 
 
 26
 However, where partnership profits were insufficient to cover the amounts paid as compensation to the partners, such amounts were considered as paid from each partner's capital. To the extent a partner's compensation was considered a return of his own capital, that partner received no taxable income. However, to the extent he was considered to receive the compensation from the capital of his fellow partners, the recipient partner received taxable income and his fellow partners were allowed a deduction for ordinary and necessary business expenses to the extent of their capital depletions. Augustine M. Lloyd, supra at 88-89." R. 170-172.
 
 
 27
 It was this type of complication and confusion that Congress tried to rectify with the 1954 Code revisions. With the enactment of Section 707(c), Congress intended to permit partners to arrange for the payment of compensation to a partner in the form of a guaranteed payment, with such payment being treated as ordinary income to the partner receiving the payment and as a deductible expense to the partnership, if such payment fell within the specifications of Section 61(a) or Section 162(a) of the Code. Miller v. I. R. C., 52 T.C. 752, 759 (1969); F. A. Falconer, 40 T.C. 1011 (1963).
 
 
 28
 But it does not follow, as Taxpayers argue, that Congress intended that a guaranteed payment by a partnership to a partner is an expense which is automatically deductible by the partnership. In Senate Committee Report, 83d Cong., 2d Sess., S.Rep. 1622 (1954), p. 92, U.S.Code Cong. & Admin.News 1954, p. 4725, it is stated: "The House bill provides that payment of a fixed or guaranteed amount for services is to be treated as salary income to the recipient and allowed as a business deduction to the partnership." Revenue Ruling 69-186, 1969 I.C.B. 185, states: "Thus, a guaranteed payment is includable in the gross income of the recipient as ordinary income and is deductible by the partnership from its ordinary income as a business expense." Standing alone, this may seem persuasive, but we view it as most improbable (and we find no indication to this effect) that Congress intended to provide deductions to a partnership not permitted any other taxpayer. It is more reasonable to conclude that a guaranteed payment to a partner should be treated the same as if it had been made to a non-partner. Thus, it would be deductible to a partnership if it was a necessary and ordinary business expense pursuant to Section 162(a),[5] irrespective of whether made to a partner or a non-partner. Correspondingly, if a payment made to a partner would be a capital expenditure under Section 263(a)[6] if made to a non-partner, then such payment should not receive different treatment because made to a partner. This is to say that it should be capitalized. Willis, Partnership Taxation (2d ed. 1976), Vol. I, § 20.04; Rev.Rul. 75-214, 1975 Int.Rev.Bul. 9. See Herbert Shainberg, 33 T.C. 241, 249-251 (1959); A. Rhett duPont, 19 T.C. 377, 381 (1952).[7]
 
 
 29
 Having rejected Taxpayers' argument regarding deductibility of a guaranteed payment to a partner regardless of the nature of the payment, we turn to consideration of the nature of the payment in question here. To be deductible as a business expense, it must usually be shown that an expenditure was part of the cost of operating the business for the year in which such expenditure was made. When, however, an expenditure is made for the acquisition of an asset the useful life of which will extend beyond the year in which cost is incurred, such expenditure is considered as a capital item, and is not generally deductible as a business expense.
 
 
 30
 We have found no cases directly analogous to the fact situation presented here, but the courts have of course addressed themselves many times to the issue of whether an expenditure was an ordinary business expense or was a capital expenditure. In Woodward v. C. I. R., 1970, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577, the petitioner-taxpayer wanted to deduct, as an ordinary business expense, expenses incurred in the appraisal of minority stockholders' stock in connection with the majority stockholders' acquisition of such stock. The Supreme Court took note of the long recognized position "that costs incurred in the acquisition or disposition of a capital asset are to be treated as capital," id. at 575, 90 S.Ct. at 1305, 25 L.Ed.2d at 581, and found the acquisition costs to be a capital expenditure.
 
 
 31
 The Tax Court has similarly held that expenses in the construction of a shopping center were capital expenses, Perlmutter v. Commissioner, 44 T.C. 382 (1965), and even expenditures made to accountants who audited the construction operations of a contractor erecting a new building for the taxpayer were held to be non-deductible capital expenses. Shainberg v. Commissioner, 33 T.C. 241 (1959).
 
 
 32
 In United States v. Akin, 10 Cir. 1957, 248 F.2d 742, cert. denied 1958, 355 U.S. 956, 78 S.Ct. 542, 2 L.Ed.2d 532, the court attempted to establish some guidelines in distinguishing between current expenses and capital outlays. "(I)t may be said in general terms that an expenditure should be treated as one in the nature of a capital outlay if it brings about the acquisition of an asset having a period of useful life in excess of one year or if it secures a like advantage to the taxpayer which has a life of more than one year." Id. at 744. See Darlington-Hartsville Coca-Cola Bottling Co. v. United States, D.S.C.1967, 273 F.Supp. 229.
 
 
 33
 It is a settled principle that expenditures for corporate organization are capital expenses, Transamerica Corporation v. United States, N.D.Cal.1966, 254 F.Supp. 504; so, too, are merger expenses, Mills Estate, Inc. v. Commissioner of Internal Revenue, 2 Cir. 1953, 206 F.2d 244, Vermont Bank and Trust Co. v. United States, D.Vt.1969, 296 F.Supp. 682; Rev.Rul. 125, 1967-1, Cum.Bul. 31. Included under this classification have also been expenditures incurred in the organization of a partnership, Meldrum & Fewsmith, Inc., 20 T.C. 790 (1953); cf. Mills Estate, Inc., 17 T.C. 910 (1951), rev'd on other grounds, 2 Cir. 1953, 206 F.2d 244.
 
 
 34
 In the present case the kinds of services for which the $90,000 fee was paid to the managing partner (as noted in detail in the statement of facts) included a feasibility study, extensive work with the architects and construction general contractors, and arranging of financing. None of the fees expended was utilized for the actual management of the finished rental property, nor was there any intent that the money should be so used. Basically, the expenditures made were for the development of the office-showroom project. Such expenditures must be capitalized in view of the consistent holdings that an expenditure in the acquisition of a capital asset is a capital expenditure,[8] C. I. R. v. Idaho Power Co., 1974, 418 U.S. 1, 94 S.Ct. 2757, 41 L.Ed.2d 535; Acer Realty Co. v. Commissioner, 8 Cir. 1942, 132 F.2d 513, 514; Ben Perlmutter, 44 T.C. 382, 403-405 (1965); Herbert Shainberg, 33 T.C. 241 (1959). To the extent that separate consideration of the financing services provided by the managing partner is required, we adopt the views held by the Tax Court.[9]
 
 
 35
 We hold that the payment to the managing partner was in the nature of a capital expenditure. The claimed deductions are a matter of legislative grace, and unless appellants clearly fall within the scope of the statute, and meet their burden of clearly showing the right to the claimed deduction, their claim must fail. Interstate Transit Lines v. Commissioner, 1943, 319 U.S. 590, 593, 63 S.Ct. 1279, 1281, 87 L.Ed. 1607, 1610; Deputy v. duPont, 1940,308 U.S. 488, 493, 60 S.Ct. 363, 366, 84 L.Ed. 416, 421; Fred W. Amend Co. v. C. I. R., 7 Cir. 1971, 454 F.2d 399.
 
 
 36
 Because we determine that the Taxpayers are outside the purview of Section 162(a) vis-a-vis 707(c), and have not established their right to the deduction claimed, we affirm the Tax Court's decision denying the right to the deduction.
 
 
 37
 AFFIRMED.
 
 
 
 [1]
 All Code references are to the Internal Revenue Code of 1954, as amended, and as applicable to the taxable year involved
 
 
 [2]
 Appellants' wives, Ann Cagle and Sylvia Webster, were parties to this action solely by virtue of having filed joint returns with their respective husbands. "Appellants" or "Taxpayers" hereinafter refer to the husbands only
 
 
 [3]
 The management agreement read as follows:
 AGREEMENT entered into August 15, 1968, between PARKWAY PROPERTY COMPANY, a General Partnership ("Company"), and JOHN F. EULICH dba THE VANTAGE COMPANY ("Manager").
 WHEREAS: Company desires to avail itself of Manager's capacity, know-how, expertise, past general experience, and over-all knowledge of all aspects of the development and management of real propetty (sic) in connection with Company's development of its property located in the Great Southwest Industrial District, Arlington, Texas.
 IT HAS BEEN AGREED by the parties hereto as follows:
 
 
 [1]
 Manager will assist and advise Company with respect to economic planning, feasibility, market analysis and the approach and appeal with respect to development of the above property
 
 
 [2]
 Manager will provide Company with techniques regarding financial, accounting and other technical aspects applicable to the development and operation of such property
 
 
 [3]
 Manager will assist in the general supervision and administration of Company's operation from the date hereof through October 31, 1969
 
 
 [4]
 Company and Manager have agreed that a reasonable fee to Manager for its services as above provided, as well as for expenses incurred by it in the performance of such services, is $110,000, which amount shall be paid as follows: $90,000 on or before December 31, 1968; $20,000 on or before October 1, 1969
 
 
 [5]
 This agreement shall be binding on the heirs, representatives, successors and assigns of the parties hereto
 
 
 [4]
 Pursuant to the partnership agreement, taxpayers' joint share of expenses was limited to $100,000, allocated pro rata. The remaining $5,972.51 loss was then distributed according to the partners' general shares in the partnership's general profit and loss: $2,986.25 to Eulich, $1,493.13 to Cagle (which he rounded off on his tax return), and $1,493.13 to Webster
 
 
 [5]
 Section 162(a), Internal Revenue Code of 1954, Title 26, U.S.Code, § 162(a), reads in relevant part:
 There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . . .
 
 
 [6]
 Section 263(a), Internal Revenue Code of 1954, Title 26, U.S.Code, § 263, reads:
 (a) General rule. No deduction shall be allowed for
 (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. This paragraph shall not apply to
 (A) expenditures for the development of mines or deposits deductible under section 616,
 (B) research and experimental expenditures deductible under section 174,
 (C) soil and water conservation expenditures deductible under section 175,
 (D) expenditures by farmers for fertilizer, etc., deductible under section 180, or
 (E) expenditures by farmers for clearing land deductible under section 182.
 (2) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made.
 (3) Except as provided in subsection (d), any amount paid as tax under section 4911 (relating to imposition of interest equalization tax).
 
 
 [7]
 We note a minor problem with respect to Income Regulation Section 1.707-1(c) which reads as follows:
 (c) Guaranteed Payments. Payments made by a partnership to a partner for services or for the use of capital are considered as made to a person who is not a partner, to the extent such payments are determined without regard to the income of the partnership. However, a partner must include such payments as ordinary income for his taxable year within or with which ends the partnership taxable year in which the partnership deducted such payments as paid or accrued under its method of accounting. See section 706(a) and paragraph (a) of § 1.706-1. Guaranteed payments are considered as made to one who is not a member of the partnership, only for the purposes of section 61(a) (relating to gross income) and section 162(a) (relating to trade or business expenses). They do not constitute an interest in partnership profits for purposes of sections 706(b)(3), 707(b), and 708(b). For the purposes of other provisions of the internal revenue laws, guaranteed payments are regarded as a partner's distributive share of ordinary income. Thus, a partner who receives guaranteed payments for a period during which he is absent from work because of personal injuries or sickness is not entitled to exclude such payments from his gross income under section 105(d). Similarly, a partner who receives guaranteed payments is not regarded as an employee of the partnership for the purposes of withholding of tax at source, deferred compensation plans, etc.
 The question arises whether, if guaranteed payments must be capitalized, the partner receiving the guaranteed payment may report such payment as income as the partnership depreciates the capital expenditure. We tend to agree with Willis, Partnership Taxation, (2d ed. 1976) Vol. I, § 20.04, that the answer clearly seems to be negative: "The regulations at § 1.707-1(c) refer to the normal situation where the payments to the partner are deductible and it just never occurred to the draftsmen of that particular regulation to carve out an exception for the case where the guaranteed payments must be capitalized under § 263."
 
 
 [8]
 Obviously the services rendered were intended to have a value beyond the year in which they were performed. This alone is a persuasive argument for labeling the payments as a capital expenditure. See Walters v. C. I. R., 6 Cir. 1967, 383 F.2d 922; General Bancshares Corp. v. United States, 8 Cir. 1964, 326 F.2d 712; United States v. Akin, 10 Cir. 1957, 248 F.2d 742, cert. denied 1958, 355 U.S. 956, 78 S.Ct. 542, 2 L.Ed.2d 532; Manhattan Co. of Virginia, Inc., 50 T.C. 78 (1968); Glenn L. Heigerick, 45 T.C. 475 (1966); S. M. Howard, 39 T.C. 833 (1963); West Virginia Steel Corp., 34 T.C. 851 (1960); KWTX Broadcasting Co., Inc., 31 T.C. 952, aff'd per curiam, 5 Cir. 1959, 272 F.2d 406
 
 
 [9]
 The Tax Court stated, R. 178-179:
 "Costs of obtaining a loan are capital expenditures which should be capitalized and deducted pro rata over the life of the loan. Detroit Consolidated Theatres v. Commissioner, 133 F.2d 200 (6th Cir. 1942), affirming per curiam a Memorandum Opinion of the Board of Tax Appeals; Herbert Enoch, 57 T.C. 781, 794-795 (1972), and cases cited therein. However, to the extent petitioners can show that the fee, or any part thereof, was an additional cost of borrowed money, rather than a charge for compensation for services rendered in obtaining the loan, such expense can be treated as interest. Herbert Enoch, supra. In the instant case Eulich apparently used his personal credit rating in obtaining a construction loan for the partnership. Cf. M. A. Long, 8 B.T.A. 737 (1927). However, under the partnership agreement Eulich could make petitioners liable for 25 percent each on any loan he obtained. Since it appears that Eulich was a general partner in Parkway Property Company he would consequently be personally liable (jointly and severally with the other partners) for the full amount of this loan in any case. Tex.Rev.Civ.Stat. art. 6132 (6132b), section 15 (1970). Thus we think the use of his own credit rating in obtaining the loan added nothing of value to the partnership, unless the loan was without recourse to the partnership (which it does not appear to be). Petitioners have presented no evidence to show that Eulich alone was liable for any loan he obtained for the partnership. Consequently, since we believe that Eulich's services essentially involved the arranging of financing for Parkway, we conclude that the compensation paid him is a capital expenditure." (Footnotes omitted)