PHILIP E. MARTIN AND EILEEN F. MARTIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Martin v. Commissioner
Docket No. 12489-79.
United States Tax Court
T.C. Memo 1982-226; 1982 Tax Ct. Memo LEXIS 519; 43 T.C.M. (CCH) 1216; T.C.M. (RIA) 82226; April 28, 1982. William A. Brandwein, for the petitioners. Eugene P. Bogner, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency in petitioners' 1972 Federal income tax in the amount of $ 13,659.01. The deficiency is attributable to certain adjustments to petitioner Philip Martin's distributive share of the losses of two real estate partnerships in which he was a partner during 1972. Two issues are presented for decision: (1) Whether the entire amount of a $ 64,500 payment to partner Jack Carpenter by one of the partnerships was required to be capitalized as part of the cost of construction of an apartment complex. (2) Whether any portion of the ordinary losses reported by the partnerships was required to be allocated *521 to partner Paul Sharfin, whose interests in the partnerships were purchased by the other two partners on September 21, 1972. FINDINGS OF FACT Most of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioners Philip Martin (hereinafter petitioner) and Eileen Martin are husband and wife and resided in Worthington, Ohio when they filed their petition in this case. They timely filed a joint Federal income tax return for 1972 with the Internal Revenue Service Center in Cincinnati, Ohio. Eileen Martin is a party to this action solely because she filed a joint return with her husband for the year in question. On July 9, 1970, petitioner, Jack Carpenter and Paul Sharfin executed a partnership agreement for the formation of a general partnership called Floral Park Development Company (hereinafter referred to as General). The stated purpose of General was to develop apartments on a 57-acre tract of land owned by Jack Carpenter and petitioner which was transferred to the partnership as their capital contribution. The partnership agreement stated that the 57 acres had a fair market value *522 of $ 928,000 on July 9, 1970. The amount of the mortgage indebtedness, including accrued interest, was $ 282,216 on that date. The agreement provided that Paul Sharfin was to contribute $ 75,000 as his capital contribution, to be paid as follows: $ 25,000
July 9, 1970
$ 25,000
January 15, 1971
$ 25,000
January 1, 1972
The agreement further provided that Sharfin was not to receive any interest on his capital contribution, and was not required to pay any interest on any unpaid portion of his capital contribution. Only the first $ 25,000 payment was made by Sharfin. For the purpose of allocating profits, losses and cash flow, and for fixing distributive shares for Federal income tax purposes, General was divided into 100 units, as follows: Carpenter
50.0
Petitioner
37.5
Sharfin
12.5
100.0
General never built any apartments. On February 23, 1971, Carpenter, Sharfin and petitioner executed a second partnership agreement for a limited partnership, also called Floral Park Development Company (hereinafter referred to as Limited). The purpose of Limited was to develop apartments on 17.429 acres of the 57 acres owned by General. Both *523 General and Limited were calendar year partnerships. Limited's partnership agreement provided that the partners' capital contributions were to be made by the conveyance of the 17.429 acres from General to Limited. In addition, the agreement provided that the partners' capital accounts were to be credited in the total amount of $ 380,000 for the 17,429 acres, as follows: Carpenter
$ 190,000
Petitioner
142,500
Sharfin
47,500
$ 380,000
Thus, Sharfin was credited with a 12.5-percent interest in partnership capital. For the purpose of allocating profits, losses and cash flow, and for fixing distributive shares for Federal income tax purposes, Limited was divided into 400 units, as follows: General Partners
No. of Units
Carpenter
100
Petitioner
75
Sharfin
24
Original Class A
Limited Partner
Sharfin
1
Additional Class A
Limited Partners
200
Only the general partnership units and the one limited partnership unit for Sharfin were issued. None of the 200 additional Class A Limited partnership units was ever issued. Sharfin's units as a general and limited partner gave him an aggregate interest in partnership profits and *524 losses of 12.5 percent. The partners anticipated that the development of the apartments on the Limited acreage would ultimately cost over $ 3,000,000. Sharfin acted as the construction superintendent on the project until October 1, 1971, when he was ordered off the job by Carpenter and petitioner after a dispute developed. Carpenter thereafter assumed the duties of construction superintendent. On December 20, 1971, Sharfin filed a complaint against both partnerships, Carpenter and petitioner in which he asked that the partnerships be dissolved and the proceeds of dissolution be divided among the partners. The defendants filed an answer seeking a dismissal of the complaint. In addition, the partnerships filed a counterclaim against Sharfin demanding, among other things, that (1) a judgment be entered in favor of General for the $ 50,000 unpaid capital contribution owed by Sharfin; (2) a $ 300,000 judgment be entered in favor of Limited to compensate it for damages allegedly caused by Sharfin's negligence in performing his duties as construction superintendent; (3) Sharfin be expelled from both partnerships, (4) both partnerships be allowed to continue in business, and (5) a *525 settlement be made among the partners by the court. On May 23, 1972, General and Limited, acting through Carpenter and petitioner, executed a written agreement to sell the 57 acress of real estate, including the apartment project then under construction by Limited. The total sales price was $ 3,996,915. Closing for the transfer of the undeveloped acreage owned by General was held on September 21, 1972, and closing for the acreage and apartments owned by Limited was held on November 17, 1972. Notes issued by the buyer were made payable to "Floral Park Development Company, an Ohio general partnership, and to Paul Sharfin as his interests appear in a purchase agreement dated September 20, 1972…" On September 21, 1972, the parties in the pending lawsuits executed an agreement (Purchase Agreement) in which Sharfin agreed to sell all of his "rights, title, interest, and claims under and in" the partnerships to petitioner and Carpenter for $ 33,500 in cash, plus a trailer, an acetylene torch, and a release from personal liability for any debts of the partnerships. They also agreed that all pending litigation among the partners and the partnerships was to be dismissed. Neither *526 the Purchase Agreement nor the General and Limited partnership agreements set forth the manner in which Sharfin's share of the partnership losses for the period ending with the date of sale was to be allocated among the partners for either book or Federal income tax purposes. During 1972 Limited paid the sum of $ 64,500 to Jack Carpenter and deducted it as an ordinary expense on its 1972 partnership tax return. Of this amount, $ 50,000 was intended to reimburse Carpenter for money which he had put up as bonding collateral in connection with the project and which, because of a surety's bankruptcy, he never recovered. The remaining $ 14,500 was intended to compensate him for overseeing the construction of the project after Sharfin was ordered off the job and for supervising the leasing of the apartments. Other individuals, notably a construction supervisor and an apartment resident manager, were subsequently hired to assume direct responsibility for these tasks. On their 1971 partnership tax returns General and Limited reported ordinary losses of $ 20,703.19 and $ 149,034.29, respectively. These losses were allocated 50 percent to Carpenter, 37.5 percent to petitioner and 12.5 *527 percent to Sharfin. On its 1972 partnership tax return General reported an ordinary loss of $ 19,205.32 and allocated it in equal shares to Carpenter and petitioner. None of the loss was allocated to Sharfin. Petitioner claimed $ 9,602.66 of the loss on his 1972 individual return. On its 1972 partnership tax return Limited reported an ordinary loss of $ 287,077.10 and allocated it in equal shares to Carpenter and petitioner. Included in this loss was a $ 64,500 deduction for the payment to Carpenter. Petitioner claimed $ 143,538.55 of the loss on his 1972 individual return. Sharfin did not receive Schedule K-1's from the partnerships for 1972 and did not report any portion of the losses on his 1972 individual return. However, in a letter to the partnerships' accountant dated March 18, 1974, Sharfin's accountant stated that Sharfin had never received copies of the partnerships' tax returns for 1972 and would like to have them so that he could "be advised of his tax obligations regarding [those] entities." In his notice of deficiency respondent determined that the $ 64,500 payment by Limited should have been capitalized as part of the cost of apartments under construction, *528 thereby reducing Limited's ordinary loss to $ 222,577.10. He further determined that Sharfin was a partner of both Limited and General until he was bought out on September 21, 1972. Thus, respondent allocated the adjusted ordinary loss of Limited as follows: Period from 1-1-72
Period from 9-22-72
through 9-21-72
through 12-31-72
Total
Carpenter
$ 89,106.42 (50%)  $ 22,182.13 (50%)
$ 111,288.55
Petitioner
66,829.81 (37.5%)
22,182.13 (50%)
89,011.94
Sharfin
22,276.61 (12.5%)
22,276.61
$ 178,212.84        $ 44,364.26
$ 222,577.10
Since the $ 19,205.32 ordinary loss reported by General reflected the results of operations prior to September 21, 1972, respondent allocated the amount as follows: Carpenter
$ 9,602.66 (50%)
Petitioner
7,201.99 (37.5%)
Sharfin
2,400.67 (12.5%)
$ 19,205.32
In addition to the foregoing adjustments, respondent also adjusted the amount of long-term and short-term capital gain reported by Limited on the sale of its land and apartments to reflect the increase in basis resulting from the capitalization of the $ 64,500 payment to Carpenter. Petitioner *529 agrees that these adjustments are correct assuming the capitalization of the payment was proper. OPINION Issue 1. Capitalization of Carpenter fee
Petitioner has conceded that $ 50,000 of the $ 64,500 fee paid to Jack Carpenter by Limited is capital in nature and must be added to the basis of the apartment project. However, he contends that the balance of the fee was for services rendered in connection with the leasing of the apartments and is currently deductible as an ordinary operating expense. Respondent takes the position that all of the services rendered by Carpenter related to construction supervision rather than rental activities, and that such expenses are required to be capitalized as part of the cost of the constructed asset under the rationale of Commissioner v. Idaho Power Co.,418 U.S. 1 (1974). To the extent the payment represents compensation for the latter, however, respondent appears to concede its deductibility. [1]
*530 This issue is purely factual and petitioner bears the burden of proof. Both he and Jack Carpenter testified at trial that a portion of Carpenter's services involved supervision of the lease-up phase of the project, and we have no reason to doubt their testimony on this point. As we see it, the question is not whether rental services were actually performed, but rather how much of the $ 14,500 payment can be said to be allocable to such services. Although petitioner was admittedly unable to provide a precise breakdown of the services performed, we think the interests of fairness require us to make a reasonable estimate. Accordingly, using our best judgment, and weighing Carpenter's testimony to the effect that supervision of rentals was his "main job" against petitioner's testimony that most of the direct leasing activities (such as showing the apalrtments and executing the leases) were dne by subordinates under Carpenter's supervision, we hold that $ 5,000 of the payment is related to leasing operations and thus currently deductible. The balance must be capitalized as part of the construction costs. See Commissioner v. Idaho Power Co.,supra;Cagle v. Commissioner,539 F.2d 409 (5th Cir. 1976), *531 affg. 63 T.C. 86 (1974); Shainberg v. Commissioner,33 T.C. 241 (1959). Issue 2. Allocation of income among partners
Section 704(a)[2] provides, as a general rule, that a partner's distributive share of income, gain, loss, deduction or credit is to be determined by the partnership agreement. Section 706(c)(2)(A)(i) provides that the taxable year of a partnership closes with respect to a partner who sells or exchanges his entire interest in the partnership, and his distributive share for the period ending with the date of transfer is to be determined in the manner prescribed by the regulations. According to section 1.706-1(c)(2)(ii), Income Tax Regs., acceptable methods for doing so include (1) closing the books of the partnership on an interim basis, or (2) computing a pro rata portion of the amounts the partner would have reported had he remained a partner until the end of the taxable year. *532 Paul Sharfin's interests in General and Limited were purchased by the other partners on September 21, 1972, for $ 33,500 in cash plus certain other consideration. The 1972 tax returns of both partnerships allocated the capital gains and ordinary losses reported therein equally between petitioner and Jack Carpenter, who in turn reported these amounts as their distributive shares on their 1972 individual tax returns. However, both the General and Limited partnership agreements expressly provided that Sharfin was entitled to a 12.5-percent share of profits and losses. Thus, in his notice of deficiency respondent determined that Sharfin should have been allocated 12.5 percent of the ordinary loss of each partnership [3] (computed, in the case of Limited, without reduction for the $ 64,500 payment to Carpenter) for the period ending on September 21, 1972, [4] the date on which Sharfin's interests were sold. *533 Petitioner contends that Sharfin is entitled to none of the loss because the parties to the Purchase Agreement intended that the 1972 partnership losses be allocated solely between the purchasing partners. Alternatively, petitioner contends that Sharfin should be allocated only one-third of the 12.5-percent shares determined by respondent because he had only contributed one-third of the $ 75,000 capital contribution required of him under the terms of the General partnership agreement. With regard to petitioner's first argument, it is true that partners can vary the terms of their partnership agreement at any time prior to the unextended due date of the partnership's tax return for the taxable year involved. Section 761(c). [5] Such modifications may be made by either written or oral agreement. Section 1.761-1(c), Income Tax Regs. Where the modification alters the profit-sharing interests of existing partners, and does not result in the retroactive allocation of partnership income or losses to a new partner, the courts have generally given effect to the amended *534 provision provided it does not run afoul of the tax-avoidance test (later supplanted by the substantial economic effect test) [6] contained in section 704(b)(2), and does not otherwise lack economic substance.See Smith v. Commissioner,331 F.2d 298, 301 (7th Cir. 1964), affg. a Memorandum Opinion of this Court; Foxman v. Commissioner,41 T.C. 535, 554 (1964), affd. 352 F.2d 466 (3d Cir. 1965). See also the discussion in Moore v. Commissioner,70 T.C. 1024, 1033 (1978); Kresser v. Commissioner,54 T.C. 1621, 1630-1631 (1970); Snell v. United States, an unreported case ( D. Neb. 1981, 48 AFTR2d 81-6064, 81-2 USTC par. 9705); McKee, Nelson & Whitmire, Federal Taxation of Partnerships and Partners, par. 11.04[1], pp. 11-14 to 11-16 (1977). However, we need not decide here whether the purported retroactive allocation to the remaining partners of Sharfin's share of the partnership losses through the sale date should be respected because there is no evidence to indicate that the partners ever came to any agreement, either written or oral, concerning who was to have the benefit of Sharfin's *535 distributive share of the pre-transfer losses.The partnership agreements give no guidance as to how losses were to be divided in the event one of the partners sold or liquidated his interest during the taxable year. The Purchase Agreement is equally silent on this matter, stating only that Sharfin agrees to sell all of his "rights, title, interest, and claims under and in" the General and Limited partnerships. Thus, there is nothing in any of the pertinent written documents which would alter the rofit-sharing percentages explicitly spelled out in the partnership agreements. *536 Petitioner testified, nevertheless, that Sharfin "understood" that he was not to claim any portion of the parltnership losses for 1972. However, his testimony is self-serving and not corroborated by any other evidence. Charles Klausman, an attorney who represented the partnerships during 1972 and reviewed the terms of the Purchase Agreement prior to its execution, testified that he did not recall whether the partners had reached any oral agreement with respect to the allocation of losses incurred through the date of transfer. Furthermore, when Jack Carpenter was asked at trial whether Sharfin had at any time during the purchase negotiations disclaimed his right to claim any portion of the 1972 losses, he replied "I don't believe so." Sharfin himself was not called as a witness, and no other evidence concerning the alleged oral agreement was introduced at trial. Under these circumstances we conclude that petitioner has not carried his burden of proving the existence of a written or oral agreement or shared understanding which, through the operation of section 761(c) and 704(a), would have the effect of modifying the profit-sharing ratios contained in the partnership agreements. *537 [7]
As an alternative argument, petitioner contends that Sharfin should be allocated no more than one-third of the distributive shares to which he was otherwise entitled because at the time he sold his partnership interests he had contributed only one-third of the $ 75,000 capital contribution called for in the General partnership agreement. [8] The agreement required petitioner to make three payments of $ 25,000 each on July 9, 1970, January 15, 1971, and January 1, 1972. Only the first $ 25,000 payment was made. Thus, Sharfin was delinquent *538 throughout most of 1971 and remained in that status until he was bought out in 1972, promping petitioner to argue that his profit-sharing percentage should be reduced by two-thirds to reflect the failure to make the required capital contributions. We disagree. For pre-1976 taxable years, the only limitations imposed upon the partners' right to fix their distributive shares for tax purposes, other than those limitations which the partners themselves may agree upon, [9] are as follows: (1) where the allocation involves an "item" of income, gain, loss, deduction or credit, it will be disregarded if the principal purpose of the allocation is the avoidance or evasion of tax, see section 704(b)(2); and (2) where the allocation involves bottom-line income or loss, it must have economic substance in the sence that it reflects the actual division of income or loss among the partners when *539 viewed from the standpoint of economic, rather than tax, consequences, see Holladay v. Commissioner,72 T.C. 571 (1979), affd. 649 F.2d 1176 (5th Cir. 1981); Boynton v. Commissioner,72 T.C. 1147 (1979), affd. 649 F.2d 1168 (5th Cir. 1981); Kresser v. Commissioner,54 T.C. 1621 (1970). It is debatable whether or not the reference to "item" in section 704(b)(2) (prior to its amendment in 1976) was intended to encompass allocations of bottom-line income or loss. See generally the discussion in Holladay v. Commissioner,72 T.C. at 586. We need not decide that issue here, however, because if the partners had allocated the pre-transfer losses to Sharfin in accordance with the ratio provided in the partnership agreements, those allocations would not, in our judgment, be susceptible to attack on the ground that they promoted a tax-avoidance purpose. Nor do we view the allocations as lacking in economic substance merely because Sharfin had failed to pay in a portion of his required capital contribution to the General partnership. The fact is that he had already made one $ 25,000 payment *540 and was under a binding contractual obligation to make the other two. General clearly could have enforced this debt through legal proceedings, just as it attempted to do when it filed a counterclaim in connection with Sharfin's suit to dissolve General and Limited. Furthermore, his failure to pay was a matter which could have been, and presumably was, taken into account by Carpenter and petitioner when they negotiated the terms of the Purchase Agreement and the settlement of the pending lawsuits. It is difficult for us to see, under these circumstances, why Sharfin's delinquency should render all or a portion of his loss allocation invalid for lack of economic substance. Moreover, we note that, although Sharfin was also delinquent in 1971, he nevertheless was allocated his full share of the partnership losses for that year--a circumstance which obviously tends to undercut petitioner's argument with respect to the 1972 allocations. Petitioner places *541 great reliance on Harrell v. Commissioner,T.C. Memo. 1978-211, arguing that it supports a reduced allocation to Sharfin because of his failure to make required capital contributions. In Harrell, a partnership agreement called for an equal division of losses between two partners and for equal capital contributions by each. One partner contributed no capital, however, and the agreement was silent as to the effect of that partner's delinquency on the loss-sharing ratio. On the basis of the particular facts of that case, this Court saw fit to infer an intention to allocate all the losses to the party who had made all of the capital contributions. Here, by contrast, Sharfin had made part of his required contribution and was legally bound to pay the remainder. On this record we feel we do not have the latitude to disregard the express provisions of the partnership agreements and infer an intention to allocate a reduced share of the partnership losses to Sharfin. The parties to the Purchase Agreemet certainly could have agreed to have Sharfin receive a lesser distrbutive share, or no distributive share at all, but they left the matter unattended. Hence, the allocations *542 provided in the partnership agreements, as modified by section 706(c)(2)(A) and section 1.706-1(c)(2)(ii), Income Tax Regs., to reflect Sharfin's mid-year departure, must prevail. Thus, we hold that Sharfin must be allocated 12.5 percent of the ordinary losses o General and Limited which were incurred through September 21, 1972, and the share of the losses claimed by petitioner must be reduced accordingly. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. The record is unclear as to whether the apartment project had reached the operational phase during the taxable year in issue. If it was not operational, the leasing expenses would constitute nondeductible pre-opening expenses under the rationale of Richmond Television Corp. v. United States,345 F.2d 901 (4th Cir. 1965), vacated and remanded on other issues 382 U.S. 68 (1965). See also Madison Gas & Electric Co. v. Commissioner,72 T.C. 521, 566-567 (1979), affd. 633 F.2d 512↩ (7th Cir. 1980). Respondent has not raised this issue and therefore we do not address it.
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise indicated. Section 704 states as follows: SEC. 704. PARTNER'S DISTRIBUTIVE SHARE. (a) EFFECT OF PARTNERSHIP AGREEMENT.--A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this section, be determined by the partnership agreement. (b) DISTRIBUTIVE SHARE DETERMINED BY INCOME OR LOSS RATIO.--A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss of the partnership, as described in section 702(a)(9), for the taxable year, if-- (1) the partnership agreement does not provide as to the partner's distributive share of such item, or (2) the principal purpose of any provision in the partnership agreement with respect to the palrtner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle.↩
3. Respondent has conceded the correctness of the 50/50 allocation between Carpenter and petitioner insofar as it pertains to the short-term and long-term capital gains reported by the partnerships on the sale of the real estate. ↩
4. Petitioner has raised no objection to the manner in which respondent allocated the adjusted year-end ordinary loss of Limited to the taxable periods before and after the date of sale as required by section 1.706-1(c)(2)(ii), Income Tax Regs.↩
5. SEC. 761. TERMS DEFINED. (c) PARTNERSHIP AGREEMENT.--For purposes of this subchapter, a partnership agreement includes any modifications of the partnership agreement made prior to, or at, the time prescribed by law for the filing of the partnership reutnr for the taxable year (not including extensions) which are agreed to by all the partners, or which are adopted in such other manner as may be provided by the partnership agreement. ↩
6. Sec. 704↩ was amended by sec. 213(d), Tax Reform Act of 1976, Pub.L. 94-455, 90 Stat. 1597, to replace the tax-avoidance or evasion test with a substantial economic effect test and expressly to include bottom-line allocations within its purview.
7. The fact that Sharfin waited until 1974 to ask for information regarding his distributive shares could be construed as an indication that he had agreed not to take any of the 1972 losses on his individual return. However, in view of the fact that he never received Schedule K-1's from the partnerships informing him of his distributive shares, it is possible that he was simply ignorant of his right to claim a portion of the losses. Also, there is no evidence to substantiate petitioner's charge that Sharfin waited until after he discovered that petitioner was under audit to demand information concerning his share of the partnership losses.↩
8. This argument applies equally to both General and Limited, since petitioner's sole contributed capital in Limited consisted of whatever interest he had in the real estate conveyed to Limited by General.↩
9. Neither the General nor Limited partnership agreements contained a provision calling for a shift in the partners' relative profit-sharing percentages in the event one of them failed to make a required capital contribution.↩